# PENNHURST STATE SCHOOL AND HOSPITAL ET AL.
## *v.* HALDERMAN ET AL.

No. 81–2101.   Argued February 22, 1983—Reargued October 3, 1983—
Decided January 23, 1984

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, *post,* p. 125. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post,* p. 126.

*H. Bartow Farr III* and *Allen C. Warshaw* reargued the cause for petitioners. With them on the briefs were *Thomas M. Kittredge, Joel I. Klein, LeRoy S. Zimmerman, Robert B. Hoffman, Debra K. Wallet, Alan J. Davis,* and *Mark A. Aronchick.*

*David Ferleger* reargued the cause and filed a brief for respondents Halderman et al. *Thomas K. Gilhool* reargued the cause for respondents Pennsylvania Association for Retarded Citizens et al. With him on the brief were *Frank J. Laski* and *Michael Churchill. Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Assistant Attorneys General Cooper* and *Wilkinson, Brian K. Landsberg,* and *Frank Allen* filed a brief for the United States.*

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether a federal court may award injunctive relief against state officials on the basis of state law.

---

*A brief of *amici curiae* was filed for the State of Alabama et al. by *Francis X. Bellotti,* Attorney General of Massachusetts, *Thomas R. Kiley,* First Assistant Attorney General, and *Carl Valvo, William L. Pardee,* and *Judith S. Yogman,* Assistant Attorneys General, joined by the Attorneys General for their respective jurisdictions as follows: *Charles A. Graddick* of Alabama, *Robert K. Corbin* of Arizona (by *Anthony Ching,* Solicitor General), *J. D. MacFarlane* of Colorado, *Carl R. Ajello* of Connecticut, *Richard S. Gebelein* of Delaware, *Michael J. Bowers* of Georgia, *Tyrone C. Fahner* of Illinois, *Linley E. Pearson* of Indiana, *Thomas J. Miller* of Iowa, *Steven L. Beshear* of Kentucky, *Frank J. Kelley* of Michigan, *John D. Ashcroft* of Missouri, *Paul L. Douglas* of Nebraska, *Richard H. Bryan* of Nevada, *Gregory H. Smith* of New Hampshire, *Irwin I. Kimmelman* of New Jersey, *Rufus L. Edmisten* of North Carolina, *Robert O. Wefald* of North Dakota, *Hector Reichard* of Puerto Rico, *David L. Wilkinson* of Utah, *Bronson C. La Follette* of Wisconsin, *Steven Freudenthal* of Wyoming, and *Aviata F. Fa'Aleveo* of American Samoa.

I

This litigation, here for the second time, concerns the conditions of care at petitioner Pennhurst State School and Hospital, a Pennsylvania institution for the care of the mentally retarded. See *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981). Although the litigation's history is set forth in detail in our prior opinion, see *id.*, at 5–10, it is necessary for purposes of this decision to review that history.

This suit originally was brought in 1974 by respondent Terri Lee Halderman, a resident of Pennhurst, in the District Court for the Eastern District of Pennsylvania. Ultimately, plaintiffs included a class consisting of all persons who were or might become residents of Pennhurst; the Pennsylvania Association for Retarded Citizens (PARC); and the United States. Defendants were Pennhurst and various Pennhurst officials; the Pennsylvania Department of Public Welfare and several of its officials; and various county commissioners, county mental retardation administrators, and other officials of five Pennsylvania counties surrounding Pennhurst. Respondents' amended complaint charged that conditions at Pennhurst violated the class members' rights under the Eighth and Fourteenth Amendments; § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, 29 U. S. C. § 794; the Developmentally Disabled Assistance and Bill of Rights Act, 89 Stat. 496, 42 U. S. C. § 6001 *et seq.;* and the Pennsylvania Mental Health and Mental Retardation Act of 1966 (MH/MR Act), Pa. Stat. Ann., Tit. 50, §§ 4101–4704 (Purdon 1969 and Supp. 1983–1984). Both damages and injunctive relief were sought.

In 1977, following a lengthy trial, the District Court rendered its decision. *Halderman* v. *Pennhurst State School and Hospital*, 446 F. Supp. 1295. As noted in our prior opinion, the court's findings were undisputed: "Conditions at Pennhurst are not only dangerous, with the residents often physically abused or drugged by staff members, but also in-

adequate for the 'habilitation' of the retarded. Indeed, the court found that the physicial, intellectual, and emotional skills of some residents have deteriorated at Pennhurst." 451 U. S., at 7 (footnote omitted). The District Court held that these conditions violated each resident's right to "minimally adequate habilitation" under the Due Process Clause and the MH/MR Act, see 446 F. Supp., at 1314–1318, 1322–1323; "freedom from harm" under the Eighth and Fourteenth Amendments, see *id.*, at 1320–1321; and "nondiscriminatory habilitation" under the Equal Protection Clause and § 504 of the Rehabilitation Act, see *id.*, at 1321–1324. Furthermore, the court found that "due process demands that if a state undertakes the habilitation of a retarded person, it must do so in the *least restrictive setting* consistent with that individual's habilitative needs." *Id.*, at 1319 (emphasis added). After concluding that the large size of Pennhurst prevented it from providing the necessary habilitation in the least restrictive environment, the court ordered that "immediate steps be taken to remove the retarded residents from Pennhurst." *Id.*, at 1325. Petitioners were ordered "to provide suitable community living arrangements" for the class members, *id.*, at 1326, and the court appointed a Special Master "with the power and duty to plan, organize, direct, supervise and monitor the implementation of this and any further Orders of the Court." *Ibid.*[1]

The Court of Appeals for the Third Circuit affirmed most of the District Court's judgment. *Halderman* v. *Pennhurst State School and Hospital,* 612 F. 2d 84 (1979) (en banc). It agreed that respondents had a right to habilitation in the least restrictive environment, but it grounded this right solely on the "bill of rights" provision in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6010. See 612 F. 2d, at 95–100, 104–107. The court did

---

[1] The District Court determined that the individual defendants had acted in good faith and therefore were immune from the damages claims. 446 F. Supp., at 1324.

not consider the constitutional issues or § 504 of the Rehabilitation Act, and while it affirmed the District Court's holding that the MH/MR Act provides a right to adequate habilitation, see *id.*, at 100–103, the court did not decide whether that state right encompassed a right to treatment in the least restrictive setting.

On the question of remedy, the Court of Appeals affirmed except as to the District Court's order that Pennhurst be closed. The court observed that some patients would be unable to adjust to life outside an institution, and it determined that none of the legal provisions relied on by respondents precluded institutionalization. *Id.*, at 114–115. It therefore remanded for "individual determinations by the [District Court], or by the Special Master, as to the appropriateness of an improved Pennhurst for each such patient," guided by "a presumption in favor of placing individuals in [community living arrangements]." *Ibid.*[2]

On remand the District Court established detailed procedures for determining the proper residential placement for each patient. A team consisting of the patient, his parents or guardian, and his case manager must establish an individual habilitation plan providing for habilitation of the patient in a designated community living arrangement. The plan is subject to review by the Special Master. A second master, called the Hearing Master, is available to conduct hearings, upon request by the resident, his parents, or his advocate, on the question whether the services of Pennhurst would be more beneficial to the resident than the community living arrangement provided in the resident's plan. The Hearing Master then determines where the patient should reside,

---

[2] In a companion case, the Court of Appeals affirmed the District Court's denial of the Pennhurst Parents-Staff Association's motion to intervene for purposes of appeal, finding the denial harmless error. See *Halderman* v. *Pennhurst State School and Hospital*, 612 F. 2d 131 (1979) (en banc). The Association subsequently was granted leave to intervene and is a petitioner in this Court.

subject to possible review by the District Court. See App. 123a–134a (Order of Apr. 24, 1980).[3]

This Court reversed the judgment of the Court of Appeals, finding that 42 U. S. C. § 6010 did not create any substantive rights. *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981). We remanded the case to the Court of Appeals to determine if the remedial order could be supported on the basis of state law, the Constitution, or § 504 of the Rehabilitation Act. See *id.*, at 31.[4] We also remanded for consideration of whether any relief was available under other provisions of the Developmentally Disabled Assistance and Bill of Rights Act. See *id.*, at 27–30 (discussing 42 U. S. C. §§ 6011(a), 6063(b)(5) (1976 ed., Supp. V)).

On remand the Court of Appeals affirmed its prior judgment in its entirety. 673 F. 2d 647 (1982) (en banc). It determined that in a recent decision the Supreme Court of Pennsylvania had "spoken definitively" in holding that the MH/MR Act required the State to adopt the "least restrictive environment" approach for the care of the mentally retarded. *Id.*, at 651 (citing *In re Schmidt*, 494 Pa. 86, 429 A. 2d 631 (1981)). The Court of Appeals concluded that this state statute fully supported its prior judgment, and therefore did not

---

[3] On July 1, 1981, Pennsylvania enacted an appropriations bill providing that only $35,000 would be paid for the Masters' expenses for the fiscal year July 1981 to June 1982. The District Court held the Pennsylvania Department of Public Welfare and its Secretary in contempt, and imposed a fine of $10,000 per day. Pennsylvania paid the fines, and the contempt was purged on January 8, 1982. On appeal the Court of Appeals affirmed the contempt order. *Halderman* v. *Pennhurst State School and Hospital*, 673 F. 2d 628 (1982), cert. pending, No. 81–2363.

[4] Three Justices dissented from the Court's construction of the Act, but concluded that the District Court should not have adopted the "far-reaching remedy" of appointing "a Special Master to decide which of the Pennhurst inmates should remain and which should be moved to community-based facilities. . . . [T]he court should not have assumed the task of managing Pennhurst . . . ." 451 U. S., at 54 (WHITE J., joined by BRENNAN and MARSHALL, JJ., dissenting in part).

reach the remaining issues of federal law. It also rejected petitioners' argument that the Eleventh Amendment barred a federal court from considering this pendent state-law claim. The court noted that the Amendment did not bar a federal court from granting prospective injunctive relief against state officials on the basis of federal claims, see 673 F. 2d, at 656 (citing *Ex parte Young*, 209 U. S. 123 (1908)), and concluded that the same result obtained with respect to a pendent state-law claim. It reasoned that because *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175 (1909), an important case in the development of the doctrine of pendent jurisdiction, also involved state officials, "there cannot be . . . an Eleventh Amendment exception to that rule." 673 F. 2d, at 658.[5] Finally, the court rejected petitioners' argument that it should have abstained from deciding the state-law claim under principles of comity, see *id.*, at 659–660, and refused to consider petitioners' objections to the District Court's use of a Special Master, see *id.*, at 651, and n. 10. Three judges dissented in part, arguing that under principles of federalism and comity the establishment of a Special Master to supervise compliance was an abuse of discretion. See *id.*, at 662 (Seitz, C. J., joined by Hunter, J., dissenting in part); *ibid.* (Garth, J., concurring in part and dissenting as to relief). See also *id.*, at 661 (Aldisert, J., concurring) (seriously questioning the propriety of the order appointing the Special

---

[5] The Court of Appeals also noted that "the United States is an intervening plaintiff . . . against which even the state itself cannot successfully plead the Eleventh Amendment as a bar to jurisdiction," and that "the counties, even as juridical entities, do not fall within the coverage of the Eleventh Amendment. Against those defendants even money damages may be awarded." 673 F. 2d, at 656 (citation omitted).

As JUSTICE BRENNAN notes in his dissent, *post*, at 126, Judge Gibbons has expanded on his views of the Eleventh Amendment in a recent law review article. Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889 (1983). Judge Gibbons was the author of both the first and second opinions by the Court of Appeals in this case.

Master, but concluding that a retroactive reversal of that order would be meaningless).[6]

We granted certiorari, 457 U. S. 1131 (1982), and now reverse and remand.

## II

Petitioners raise three challenges to the judgment of the Court of Appeals: (i) the Eleventh Amendment prohibited the District Court from ordering state officials to conform their conduct to state law; (ii) the doctrine of comity prohibited the District Court from issuing its injunctive relief; and (iii) the District Court abused its discretion in appointing two Masters to supervise the decisions of state officials in implementing state law.   We need not reach the latter two issues, for we find the Eleventh Amendment challenge dispositive.

## A

Article III, § 2, of the Constitution provides that the federal judicial power extends, *inter alia*, to controversies "between a State and Citizens of another State."   Relying on this language, this Court in 1793 assumed original jurisdiction over a suit brought by a citizen of South Carolina against the State of Georgia.   *Chisholm* v. *Georgia*, 2 Dall. 419 (1793).   The decision "created such a shock of surprise that the Eleventh Amendment was at once proposed and adopted."   *Monaco* v. *Mississippi*, 292 U. S. 313, 325 (1934). The Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

---

[6] The Office of the Special Master was abolished in December 1982.   See App. 220a (Order of Aug. 12, 1982).   The Hearing Master remains in operation.

The Amendment's language overruled the particular result in *Chisholm*, but this Court has recognized that its greater significance lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III. Thus, in *Hans* v. *Louisiana*, 134 U. S. 1 (1890), the Court held that, despite the limited terms of the Eleventh Amendment, a federal court could not entertain a suit brought by a citizen against his own State. After reviewing the constitutional debates concerning the scope of Art. III, the Court determined that federal jurisdiction over suits against unconsenting States "was not contemplated by the Constitution when establishing the judicial power of the United States." *Id.*, at 15. See *Monaco* v. *Mississippi, supra*, at 322–323.[7] In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III:

> "That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that *the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given:* not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but

---

[7] See *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279, 291–292 (1973) (MARSHALL, J., concurring in result) (The Eleventh Amendment "clarif[ied] the intent of the Framers concerning the reach of the federal judicial power" and "restore[d] the original understanding" that States could not be made unwilling defendants in federal court). See also *Nevada* v. *Hall*, 440 U. S. 410, 430–431 (1979) (BLACKMUN, J., dissenting); *id.*, at 437 (REHNQUIST, J., dissenting).

an exemplification." *Ex parte State of New York*, 256 U. S. 490, 497 (1921) (emphasis added).[8]

A sovereign's immunity may be waived, and the Court consistently has held that a State may consent to suit against it in federal court. See, *e. g.*, *Clark* v. *Barnard*, 108 U. S. 436, 447 (1883). We have insisted, however, that the State's consent be unequivocally expressed. See, *e. g.*, *Edelman* v. *Jordan*, 415 U. S. 651, 673 (1974). Similarly, although Congress has power with respect to the rights protected by the Fourteenth Amendment to abrogate the Eleventh Amendment immunity, see *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), we have required an unequivocal expression of congressional intent to "overturn the constitutionally guaranteed immunity of the several States." *Quern* v. *Jordan*, 440 U. S. 332, 342 (1979) (holding that 42 U. S. C. § 1983 does not override States' Eleventh Amendment immunity). Our reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system. A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued.[9] As JUSTICE MARSHALL well has noted, "[b]e-

---

[8] The limitation deprives federal courts of any jurisdiction to entertain such claims, and thus may be raised at any point in a proceeding. "The Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment . . . even though urged for the first time in this Court." *Ford Motor Co.* v. *Department of Treasury of Indiana*, 323 U. S. 459, 467 (1945).

[9] For this reason, the Court consistently has held that a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts. See, *e. g.*, *Florida Dept. of Health and Rehabilitative Services* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 150 (1981) *(per curiam)*. "[I]t is not consonant with our dual system for the federal courts . . . to read the consent to embrace federal as well as state courts. . . . [A] clear declaration of the state's intention to

cause of the problems of federalism inherent in making one sovereign appear against its will in the courts of the other, a restriction upon the exercise of the federal judicial power has long been considered to be appropriate in a case such as this." *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279, 294 (1973) (concurring in result).[10]    Accordingly, in deciding this case we must be guided by "[t]he principles of federalism that inform Eleventh Amendment doctrine." *Hutto* v. *Finney*, 437 U. S. 678, 691 (1978).

## B

This Court's decisions thus establish that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Employees, supra*, at 280.    There may be a question, however, whether a particular suit in fact is a suit against a State.    It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.    See, *e. g.*, *Florida Dept. of Health and Rehabilitative Services* v. *Florida Nursing Home Assn.*, 450 U. S. 147 (1981) *(per curiam); Alabama* v. *Pugh*, 438 U. S. 781 (1978) *(per curiam)*.    This jurisdictional bar applies regardless of the nature of the relief sought.    See, *e. g.*, *Missouri* v. *Fiske*, 290 U. S. 18, 27 (1933) ("Expressly applying

---

submit its fiscal problems to other courts than those of its own creation must be found." *Great Northern Life Insurance Co.* v. *Read*, 322 U. S. 47, 54 (1944).

[10] See *Nevada* v. *Hall*, 440 U. S., at 418–419 (States were "vitally interested" in whether they would be subject to suit in the federal courts, and the debates about state immunity focused on the question of federal judicial power).    Cf. *id.*, at 430–431 (BLACKMUN, J., dissenting) (sovereign immunity is "a guarantee that is implied as an essential component of federalism" and is "sufficiently fundamental to our federal structure to have implicit constitutional dimension"); *id.*, at 437 (REHNQUIST, J., dissenting) ("[T]he States that ratified the Eleventh Amendment thought that they were putting an end to the possibility of individual States as unconsenting defendants in foreign jurisdictions").

to suits in equity as well as at law, the Amendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a State").

When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself. Although prior decisions of this Court have not been entirely consistent on this issue, certain principles are well established. The Eleventh Amendment bars a suit against state officials when "the state is the real, substantial party in interest." *Ford Motor Co.* v. *Department of Treasury of Indiana*, 323 U. S. 459, 464 (1945). See, *e. g.*, *In re Ayers*, 123 U. S. 443, 487–492 (1887); *Louisiana* v. *Jumel*, 107 U. S. 711, 720–723, 727–728 (1883). Thus, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Hawaii* v. *Gordon*, 373 U. S. 57, 58 (1963) *(per curiam)*.[11] And, as when the State itself is named as the

---

[11] "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Dugan* v. *Rank*, 372 U. S. 609, 620 (1963) (citations omitted).

Respondents do not dispute that the relief sought and awarded below operated against the State in each of the foregoing respects. They suggest, however, that the suit here should not be considered to be against the State for the purposes of the Eleventh Amendment because, they say, petitioners were acting ultra vires their authority. Respondents rely largely on *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982), which in turn was founded upon *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682 (1949). These cases provide no support for this argument. These and other modern cases make clear that a state officer may be said to act ultra vires only when he acts "without any authority whatever." *Treasure Salvors*, 458 U. S., at 697 (opinion of STEVENS, J.); accord, *id.*, at 716 (WHITE, J., concurring in judgment in part and dissenting in part) (test is whether there was no "colorable basis for the exercise of authority by state officials"). As the Court in *Larson* explained, an ultra vires claim rests on "the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." *Larson, supra*, at 690. Petitioners' actions in operating this mental health institu-

defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief. See *Cory* v. *White*, 457 U. S. 85, 91 (1982).

The Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State. This was the holding in *Ex parte Young*, 209 U. S. 123 (1908), in which a federal court enjoined the Attorney General of the State of Minnesota from bringing suit to enforce a state statute that allegedly violated the Fourteenth Amendment. This Court held that the Eleventh Amendment did not prohibit issuance of this injunction. The theory of the case was that an unconstitutional enactment is "void" and therefore does not "impart to [the officer] any immunity from responsibility to the supreme authority of the United States." *Id.*, at 160. Since the State could not authorize the action, the officer was "stripped of his official or representative character and [was] subjected in his person to the consequences of his individual conduct." *Ibid.*

While the rule permitting suits alleging conduct contrary to "the supreme authority of the United States" has survived, the theory of *Young* has not been provided an expansive interpretation. Thus, in *Edelman* v. *Jordan*, 415 U. S. 651 (1974), the Court emphasized that the Eleventh Amendment bars some forms of injunctive relief against state officials for violation of federal law. *Id.*, at 666–667. In particular, *Edelman* held that when a plaintiff sues a state official alleging a violation of federal law, the federal court

---

tion plainly were not beyond their delegated authority in this sense. The MH/MR Act gave them broad discretion to provide "adequate" mental health services. Pa. Stat. Ann., Tit. 50, § 4201(1) (Purdon 1969). The essence of respondents' claim is that petitioners have not provided such services adequately.

In his dissent, JUSTICE STEVENS advances a far broader—and unprecedented—version of the ultra vires doctrine, which we discuss *infra*, at 106–117.

may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief. Under the theory of *Young*, such a suit would not be one against the State since the federal-law allegation would strip the state officer of his official authority. Nevertheless, retroactive relief was barred by the Eleventh Amendment.

## III

With these principles in mind, we now turn to the question whether the claim that petitioners violated *state law* in carrying out their official duties at Pennhurst is one against the State and therefore barred by the Eleventh Amendment. Respondents advance two principal arguments in support of the judgment below.[12] First, they contend that under the doctrine of *Edelman* v. *Jordan, supra,* the suit is not against

---

[12] We reject respondents' additional contention that Pennsylvania has waived its immunity from suit in federal court. At the time the suit was filed, suits against Pennsylvania were permitted only where expressly authorized by the legislature, see, *e. g., Freach* v. *Commonwealth,* 471 Pa. 558, 370 A. 2d 1163 (1977), and respondents have not referred us to any provision expressly waiving Pennsylvania's Eleventh Amendment immunity. The State now has a statute governing sovereign immunity, including an express preservation of its immunity from suit in federal court: "Federal courts.—Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States." 42 Pa. Cons. Stat. § 8521(b) (1980).

We also do not agree with respondents that the presence of the United States as a plaintiff in this case removes the Eleventh Amendment from consideration. Although the Eleventh Amendment does not bar the United States from suing a State in federal court, see, *e. g., Monaco* v. *Mississippi,* 292 U. S. 313, 329 (1934), the United States' presence in the case for any purpose does not eliminate the State's immunity for all purposes. For example, the fact that the federal court could award injunctive relief to the United States on federal constitutional claims would not mean that the court could order the State to pay damages to other plaintiffs. In any case, we think it clear that the United States does not have standing to assert the state-law claims of third parties. For these reasons, the applicability of the Eleventh Amendment to respondents' state-law claim is unaffected by the United States' participation in the case.

the State because the courts below ordered only prospective injunctive relief. Second, they assert that the state-law claim properly was decided under the doctrine of pendent jurisdiction. Respondents rely on decisions of this Court awarding relief against state officials on the basis of a pendent state-law claim. See, *e. g., Siler* v. *Louisville & Nashville R. Co.,* 213 U. S., at 193.

## A

We first address the contention that respondents' state-law claim is not barred by the Eleventh Amendment because it seeks only prospective relief as defined in *Edelman* v. *Jordan, supra.* The Court of Appeals held that if the judgment below rested on federal law, it could be entered against petitioner state officials under the doctrine established in *Edelman* and *Young* even though the prospective financial burden was substantial and ongoing.[13] See 673 F. 2d, at 656. The court assumed, and respondents assert, that this reasoning applies as well when the official acts in violation of state law. This argument misconstrues the basis of the doctrine established in *Young* and *Edelman.*

As discussed above, the injunction in *Young* was justified, notwithstanding the obvious impact on the State itself, on the view that sovereign immunity does not apply because an official who acts unconstitutionally is "stripped of his official or representative character," *Young,* 209 U. S., at 160. This

---

[13] We do not decide whether the District Court would have jurisdiction under this reasoning to grant prospective relief on the basis of federal law, but we note that the scope of any such relief would be constrained by principles of comity and federalism. "Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Rizzo* v. *Goode,* 423 U. S. 362, 378 (1976) (quoting *Stefanelli* v. *Minard,* 342 U. S. 117, 120 (1951)).

rationale, of course, created the "well-recognized irony" that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment. *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670, 685 (1982) (opinion of STEVENS, J.). Nonetheless, the *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to "the supreme authority of the United States." *Young, supra,* at 160. As JUSTICE BRENNAN has observed, *"Ex parte Young* was the culmination of efforts by this Court to harmonize the principles of the Eleventh Amendment with the effective supremacy of rights and powers secured elsewhere in the Constitution." *Perez* v. *Ledesma,* 401 U. S. 82, 106 (1971) (concurring in part and dissenting in part). Our decisions repeatedly have emphasized that the *Young* doctrine rests on the need to promote the vindication of federal rights. See, *e. g., Quern* v. *Jordan,* 440 U. S., at 337; *Scheuer* v. *Rhodes,* 416 U. S. 232, 237 (1974); *Georgia Railroad & Banking Co.* v. *Redwine,* 342 U. S. 299, 304 (1952).

The Court also has recognized, however, that the need to promote the supremacy of federal law must be accommodated to the constitutional immunity of the States. This is the significance of *Edelman* v. *Jordan, supra.* We recognized that the prospective relief authorized by *Young* "has permitted the Civil War Amendments to the Constitution to serve as a sword, rather than merely a shield, for those whom they were designed to protect." 415 U. S., at 664. But we declined to extend the fiction of *Young* to encompass retroactive relief, for to do so would effectively eliminate the constitutional immunity of the States. Accordingly, we concluded that although the difference between permissible and impermissible relief "will not in many instances be that between day and night," 415 U. S., at 667, an award of retroactive relief necessarily " 'fall[s] afoul of the Eleventh Amend-

ment if that basic constitutional provision is to be conceived of as having any present force.'" *Id.*, at 665 (quoting *Rothstein* v. *Wyman*, 467 F. 2d 226, 237 (CA2 1972) (McGowan, J., sitting by designation), cert. denied, 411 U. S. 921 (1973)). In sum, *Edelman*'s distinction between prospective and retroactive relief fulfills the underlying purpose of *Ex parte Young* while at the same time preserving to an important degree the constitutional immunity of the States.

This need to reconcile competing interests is wholly absent, however, when a plaintiff alleges that a state official has violated *state* law. In such a case the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

## B

The contrary view of JUSTICE STEVENS' dissent rests on fiction, is wrong on the law, and, most important, would emasculate the Eleventh Amendment.[14] Under his view, an allegation that official conduct is contrary to a state statute would suffice to override the State's protection under that Amendment. The theory is that such conduct is contrary to the official's "instructions," and thus ultra vires his authority.

---

[14] We are prompted to respond at some length to JUSTICE STEVENS' 41-page dissent in part by his broad charge that "the Court repudiates at least 28 cases," *post*, at 127. The decisions the dissent relies upon simply do not support this sweeping characterization. See nn. 19, 20, and 21, *infra*.

Accordingly, official action based on a reasonable interpretation of any statute might, if the interpretation turned out to be erroneous,[15] provide the basis for injunctive relief against the actors in their official capacities. In this case, where officials of a major state department, clearly acting within the scope of their authority, were found not to have improved conditions in a state institution adequately under state law, the dissent's result would be that the State itself has forfeited its constitutionally provided immunity.

The theory is out of touch with reality. The dissent does not dispute that the general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought. See *supra*, at 101; *post*, at 146, n. 29. According to the dissent, the relief sought and ordered here—which in effect was that a major state institution be closed and smaller state institutions be created and expansively funded—did not operate against the State. This view would make the law a pretense. No other court or judge in the 10-year history of this litigation has advanced this theory. And the dissent's underlying view that the named defendants here were acting beyond and contrary to their authority cannot be reconciled with reality—or with the record. The District Court in this case held that the individual defendants "acted in the utmost good faith . . . *within the sphere of their official responsibilities*," and therefore were entitled to immunity from damages. 446 F. Supp., at 1324 (emphasis added). The named defendants had nothing to gain personally from their conduct; they were not found to have acted willfully or even negligently. See *ibid.* The court expressly noted that the individual defendants "apparently took every means available to them to reduce the incidents of abuse and injury, but were

---

[15] In this case, for example, the court below rested its finding that state law required habilitation in the least restrictive environment on dicta in *In re Schmidt*, 494 Pa. 86, 429 A. 2d 631 (1981). That decision was not issued until seven years after this suit was filed, and four years after trial ended.

constantly faced with staff shortages." *Ibid.* It also found "that the individual defendants are dedicated professionals in the field of retardation who were given very little with which to accomplish the habilitation of the retarded at Pennhurst." *Ibid.*[16] As a result, all the relief ordered by the courts below was institutional and official in character. To the extent

---

[16] This part of the court's findings and judgment was not appealed. See *Halderman* v. *Pennhurst State School and Hospital,* 612 F. 2d 84, 90, n. 4 (1979). See also 446 F. Supp., at 1303 ("On the whole, the staff at Pennhurst appears to be dedicated and trying hard to cope with the inadequacies of the institution").

The parties defendant in this suit were not all individuals. They included as well the Pennsylvania Department of Public Welfare, a major department of the State itself; and the Pennhurst State School and Hospital, a state institution. The dissent apparently is arguing that the defendants as a group—including both the state institutions, and state and county officials—were acting ultra vires. Since the institutions were only said to have violated the law through the individual defendants, the District Court's findings, never since questioned by any court, plainly exonerate all the defendants from the dissent's claim that they acted beyond the scope of their authority.

A truth of which the dissent's theoretical argument seems unaware is the plight of many if not most of the mental institutions in our country. As the District Court in this case found: "History is replete with misunderstanding and mistreatment of the retarded." *Id.,* at 1299. Accord, Message from President Kennedy Relative to Mental Illness and Mental Retardation, H. R. Doc. No. 58, 88th Cong., 1st Sess., 13 (1963) ("We as a Nation have long neglected the mentally ill and the mentally retarded"). It is common knowledge that "insane asylums," as they were known until the middle of this century, usually were underfunded and understaffed. It is not easy to persuade competent people to work in these institutions, particularly well-trained professionals. Physical facilities, due to consistent underfunding by state legislatures, have been grossly inadequate—especially in light of advanced knowledge and techniques for the treatment of the mentally ill. See generally *id.,* at 2, 4; The President's Committee on Mental Retardation, MR 68: The Edge of Change 11–13 (1968); President's Committee on Mental Retardation, Changing Patterns in Residential Services for the Mentally Retarded 1–57 (R. Kugel & W. Wolfensberger eds. 1969); R. Scheerenberger, A History of Mental Retardation 240–243 (1983). Only recently have States commenced to move to correct widespread deplorable conditions. The responsibility, as the District Court recognized after a protracted trial, has rested on the *State itself.*

there was a violation of state law in this case, it is a case of the State itself not fulfilling its legislative promises.[17]

The dissent bases its view on numerous cases from the turn of the century and earlier. These cases do not provide the support the dissent claims to find. Many are simply miscited. For example, with perhaps one exception,[18] none of its Eleventh Amendment cases can be said to hold that injunctive relief could be ordered against state officials for failing to carry out their duties under state statutes.[19] And

---

[17] The dissent appears to be confused about our argument here. See *post*, at 138–139. It is of course true, as the dissent says, that the finding below that petitioners acted in good faith and therefore were immune from damages does not affect whether an injunction might be issued against them by a court possessed of jurisdiction. The point is that the courts below did not have jurisdiction because the relief ordered so plainly ran against the State. No one questions that the petitioners in operating Pennhurst were acting in their official capacity. Nor can it be questioned that the judgments under review commanded action that could be taken by petitioners only in their official capacity—and, of course, *only* if the State provided the necessary funding. It is evident that the dissent would vest in federal courts authority, acting solely under *state law*, to ignore the sovereignty of the States that the Eleventh Amendment was adopted to protect. Article III confers no jurisdiction on this Court to strip an explicit Amendment of the Constitution of its substantive meaning.

Contrary to the dissent's view, see *post*, at 150, an injunction based on federal law stands on very different footing, particularly in light of the Civil War Amendments. As we have explained, in such cases this Court is vested with the constitutional duty to vindicate "the supreme authority of the United States," *Ex parte Young*, 209 U. S. 123, 160 (1908). There is no corresponding mandate to enforce state law.

[18] See *Rolston* v. *Missouri Fund Commissioners*, 120 U. S. 390 (1887). In *Rolston*, however, the state officials were ordered to comply with "a plain ministerial duty," see *Great Northern Life Insurance Co.* v. *Read*, 322 U. S., at 51, a far cry from this case, see n. 20, *infra*.

[19] The cases are collected in n. 50 of the dissent, *post*, at 165–166. Several of the cases do not rest on an Eleventh Amendment holding at all. For example, federal jurisdiction in fact was held to be *lacking* in *Martin* v. *Lankford*, 245 U. S. 547 (1918), because of lack of diversity. A fair reading of *South Carolina* v. *Wesley*, 155 U. S. 542 (1895), and the cases it cites, makes clear that the ruling there was on the purely procedural point that the party pressing the appeal was not a party to the proceeding. In

the federal sovereign immunity cases the dissent relies on for analogy, while far from uniform, make clear that suit may not be predicated on violations of state statutes that command purely discretionary duties.[20]  Since it cannot be doubted

two other cases the allegation was that a state officer or agency had acted *unconstitutionally,* rather than merely contrary to state law.  *Atchison, T. & S. F. R. Co.* v. *O'Connor,* 223 U. S. 280 (1912); *Hopkins* v. *Clemson Agricultural College,* 221 U. S. 636 (1911).  In *Johnson* v. *Lankford,* 245 U. S. 541 (1918), the relief sought was not injunctive relief but money damages against the individual officer.  See n. 21, *infra.*  None of these cases can be said to be overruled by our holding today.  As noted *infra,* at 118, the *Greene* cases do not discuss the Eleventh Amendment in connection with the state-law claim.

*Tindal* v. *Wesley,* 167 U. S. 204 (1897), and *Scully* v. *Bird,* 209 U. S. 481 (1908), are more closely analogous cases.  In both of these old cases, however, the allegation was that the defendants had committed common-law torts, not, as here, that they had failed to carry out affirmative duties assigned to them by statute.  See *Tindal, supra,* at 221 (distinguishing suits brought "to enforce the discharge by the defendants of any specific duty enjoined by the State"); Tr. of Record in *Tindal* v. *Wesley,* O. T. 1896, No. 231, p. 3 (complaint alleged that defendants had "wrongfully entered into said premises and ousted the plaintiff . . . to the damage of the plaintiff ten thousand dollars"); *Scully, supra,* at 483 (allegation was that defendant had "injuriously affect[ed] the reputation and sale of [plaintiff's] products").  Tort cases such as these were explicitly overruled in *Larson* v. *Domestic & Foreign Commerce Corp.,* 337 U. S. 682 (1949).  See *infra,* at 111–114.

[20] See, *e. g., Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 620 (1912) ("The complainant did not ask the court to interfere with the official discretion of the Secretary of War, but challenged his authority to do the things of which complaint was made"); *Santa Fe Pacific R. Co.* v. *Fall,* 259 U. S. 197, 198–199 (1922) (same); see also *Kendall* v. *Stokes,* 3 How. 87, 98 (1845) ("[A] public officer is not liable to an action if he falls into error in a case where the act to be done is not merely a ministerial one, but is one in relation to which it is his duty to exercise judgment and discretion; even although an individual may suffer by his mistake"); *Noble* v. *Union River Logging R. Co.,* 147 U. S. 165, 171–172 (1893); *Belknap* v. *Schild,* 161 U. S. 10, 18 (1896) (under Eleventh Amendment, injunctive relief is permitted where officer commits a tort that is "contrary to a plain official duty requiring no exercise of discretion"); *Wells* v. *Roper,* 246 U. S. 335, 338 (1918); *Larson* v. *Domestic & Foreign Commerce Corp.,* 337 U. S., at 695 (suit challenging "incorrect decision as to law or fact" is barred "if the offi-

that the statutes at issue here gave petitioners broad discretion in operating Pennhurst, see n. 11, *supra;* see also 446 F. Supp., at 1324, the conduct alleged in this case would not be ultra vires even under the standards of the dissent's cases.[21]

Thus, while there is language in the early cases that advances the authority-stripping theory advocated by the dissent, this theory had never been pressed as far as JUSTICE STEVENS would do in this case. And when the expansive ap-

---

cer making the decision was empowered to do so"); *id.*, at 715 (Frankfurter, J., dissenting) (noting that cases involve orders to comply with nondiscretionary duties). The opinions make clear that the question of discretion went to sovereign immunity, and not to the court's mandamus powers generally. See, *e. g., Philadelphia Co., supra,* at 618–620. The rationale appears to be that discretionary duties have a greater impact on the sovereign because they "brin[g] the operation of governmental machinery into play." *Larson, supra,* at 715 (Frankfurter, J., dissenting).

[21] In any event, as with the Eleventh Amendment cases, see n. 19, *supra,* the dissent also is wrong to say that the federal sovereign immunity cases it cites *post,* at 166, n. 50, are today overruled. Many of them were actions for damages in tort against the individual officer. *Little* v. *Barreme,* 2 Cranch 170 (1804); *Wise* v. *Withers,* 3 Cranch 331 (1806); *Mitchell* v. *Harmony,* 13 How. 115 (1852); *Bates* v. *Clark,* 95 U. S. 204 (1877); *Belknap* v. *Schild,* 161 U. S. 10 (1896). In *Belknap* the Court drew a careful distinction between such actions and suits in which the relief would run more directly against the State. *Id.,* at 18. The Court disallowed injunctive relief against the officers on this basis. *Id.,* at 23–25. Contrary to the view of the dissent, *post,* at 135, n. 10, nothing in our opinion touches these cases. The Court in *Larson* similarly distinguished between cases seeking money damages against the individual officer in tort, and those seeking injunctive relief against the officer in his official capacity. It held that the latter sought relief against the sovereign, while the former might not. 337 U. S., at 687–688, and nn. 7, 8.

There is language in other cases that suggests they were actions alleging torts, not statutory violations. See *Philadelphia Co.* v. *Stimson, supra,* at 623; *Sloan Shipyards Corp.* v. *United States Shipping Bd. Emergency Fleet Corp.,* 258 U. S. 549, 568 (1922); *Land* v. *Dollar,* 330 U. S. 731, 736 (1947). The remainder clearly distinguish cases (like the present one) involving statutes that command discretionary duties. See n. 20, *supra.* In any case, the Court in *Larson* explicitly limited the precedential value of all of these cases. See *Malone* v. *Bowdoin,* 369 U. S. 643, 646, and n. 6 (1962).

proach of the dissent was advanced, this Court plainly and explicitly rejected it. In *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682 (1949), the Court was faced with the argument that an allegation that a Government official committed a tort sufficed to distinguish the official from the sovereign. Therefore, the argument went, a suit for an injunction to remedy the injury would not be against the sovereign. The Court rejected the argument, noting that it would make the doctrine of sovereign immunity superfluous. A plaintiff would need only to "claim an invasion of his legal rights" in order to override sovereign immunity. *Id.*, at 693. In the Court's view, the argument "confuse[d] the doctrine of sovereign immunity with the requirement that a plaintiff state a cause of action." *Id.*, at 692–693. The dissent's theory suffers a like confusion.[22] Under the dissent's view, a plaintiff would need only to claim a denial of rights protected or provided by statute in order to override sovereign immunity. Except in rare cases it would make the constitutional doctrine of sovereign immunity a nullity.

---

[22] In fact, as the dissent itself states, the argument in *Larson* that an allegation of tortious activity overrides sovereign immunity is essentially the same as the dissent's argument that an allegation of conduct contrary to statute overrides sovereign immunity. See *post*, at 158. The result in each case—as the Court in *Larson* recognized—turns on whether the defendant state official was empowered to do what he did, *i. e.*, whether, even if he acted erroneously, it was action within the scope of his authority. See *Larson*, 337 U. S., at 685 (controversy on merits concerned whether officer had interpreted Government contract correctly); *id.*, at 695; *id.*, at 716–717 (Frankfurter, J., dissenting) (in cases alleging a tort, the "official seeks to screen himself behind the sovereign"); *id.*, at 721–722. What the dissent fails to note is that the Court in *Larson* explicitly rejected the view that the dissent here also advances, which is "that an officer given the power to make decisions is only given the power to make correct decisions." *Id.*, at 695. The Court in *Larson* made crystal clear that an officer might make errors and still be acting within the scope of his authority. *Ibid.* (There can be no question that the defendants here were "given the power to make decisions" about the operation of Pennhurst. See n. 11, *supra*.) The dissent's view that state officers "have no discretion to commit a tort," *post*, at 132, n. 7, cannot be reconciled with the plain holding of *Larson*.

The crucial element of the dissent's theory was also the plaintiff's central contention in *Larson.* It is that "[a] sovereign, like any other principal, cannot authorize its agent to violate the law," so that when the agent does so he cannot be acting for the sovereign. *Post,* at 153; see also *post,* at 142, 148–149, 158; cf. *Larson, supra,* at 693–694 ("It is argued . . . that the commission of a tort cannot be authorized by the sovereign. . . . It is on this contention that the respondent's position fundamentally rests . . ."). It is a view of agency law that the Court in *Larson* explicitly rejected.[23] *Larson* thus made clear that, at least insofar as injunctive relief is sought, an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief effectively is against it. 337 U. S., at 690, 695.[24] Any resulting disadvantage to the plaintiff was "outweigh[ed]" by "the necessity of permitting the Govern-

---

[23] "It has been said, in a very special sense, that, as a matter of agency law, a principal may never lawfully authorize the commission of a tort by his agent. But that statement, in its usual context, is only a way of saying that an agent's liability for torts committed by him cannot be avoided by pleading the direction or authorization of his principal. The agent is himself liable whether or not he has been authorized or even directed to commit the tort. This, of course, does not mean that the principal is not liable nor that the tortious action may not be regarded as the action of the principal." 337 U. S., at 694 (footnote omitted).

[24] The *Larson* Court noted that a similar argument "was at one time advanced in connection with corporate agents, in an effort to avoid corporate liability for torts, but was decisively rejected." *Ibid.* See 10 W. Fletcher, Cyclopedia of the Law of Private Corporations § 4877, p. 350 (rev. ed. 1978) (a corporation is liable for torts committed by its agent within the scope of his authority even though the "act was contrary to or in violation of the instructions or orders given by it to the offending agent"); *id.,* § 4959 (same as to crimes).

The dissent's strained interpretation of *Larson, post,* at 153–155, simply ignores the language that the dissent itself quotes: "It is important to note that in [ultra vires] cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." 337 U. S., at 689–690.

ment to carry out its functions unhampered by direct judicial intervention." *Id.*, at 704. If anything, this public need is even greater when questions of federalism are involved. See *supra*, at 99–100.[25]

The dissent in *Larson* made many of the arguments advanced by JUSTICE STEVENS' dissent today, and asserted that many of the same cases were being overruled or ignored.

[25] As we have discussed *supra*, at 102–103, *Edelman* v. *Jordan*, 415 U. S. 651 (1974), also shows that the broad ultra vires theory enunciated in *Ex parte Young*, 209 U. S. 123 (1908), and in some of the cases quoted by the dissent has been discarded. In *Edelman*, although the state officers were alleged to be acting contrary to law, and therefore should have been "stripped of their authority" under the theory of the dissent, we held the action to be barred by the Eleventh Amendment. The dissent attempts to distinguish *Edelman* on the ground that the retroactive relief there, unlike injunctive relief, does not run only against the agent. *Post*, at 146, n. 29. To say that injunctive relief against state officials acting in their official capacity does not run against the State is to resort to the fictions that characterize the dissent's theories. Unlike the English sovereign perhaps, an American State can act only through its officials. It is true that the Court in *Edelman* recognized that retroactive relief often, or at least sometimes, has a greater impact on the state treasury than does injunctive relief, see 415 U. S., at 666, n. 11, but there was no suggestion that damages alone were thought to run against the State while injunctive relief did not.

We have noted that the authority-stripping theory of *Young* is a fiction that has been narrowly construed. In this light, it may well be wondered what principled basis there is to the ultra vires doctrine as it was set forth in *Larson* and *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982). That doctrine excepts from the Eleventh Amendment bar suits against officers acting in their official capacities but without any statutory authority, even though the relief would operate against the State. At bottom, the doctrine is based on the fiction of the *Young* opinion. The dissent's method is merely to take this fiction to its extreme. While the dissent's result may be logical, in the sense that it is difficult to draw principled lines short of that end, its view would virtually eliminate the constitutional doctrine of sovereign immunity. It is a result from which the Court in *Larson* wisely recoiled. We do so again today. For present purposes, however, we do no more than question the continued vitality of the ultra vires doctrine in the Eleventh Amendment context. We hold only that to the extent the doctrine is consistent with the analysis of this opinion, it is a very narrow exception that will allow suit only under the standards set forth in n. 11, *supra*.

See 337 U. S., at 723–728 (Frankfurter, J., dissenting). Those arguments were rejected, and the cases supporting them are moribund.   Since *Larson* was decided in 1949,[26] no opinion by any Member of this Court has cited the cases on which the dissent primarily relies for a proposition as broad as the language the dissent quotes.   Many if not most of these cases have not been relied upon in an Eleventh Amendment context at all.   Those that have been so cited have been relied upon only for propositions with which no one today quarrels.[27]   The plain fact is that the dissent's broad theory,

---

[26] The dissent appears to believe that *Larson* is consistent with all prior law.   See *post*, at 153.   This view ignores the fact that the *Larson* Court itself understood that it was required to "resolve [a] conflict in doctrine." 337 U. S., at 701.   The Court since has recognized that *Larson* represented a watershed in the law of sovereign immunity.   In *Malone* v. *Bowdoin*, 369 U. S. 643 (1962), Justice Stewart's opinion for the Court observed that "to reconcile completely all the decisions of the Court in this field prior to 1949 would be a Procrustean task."   *Id.*, at 646.   His opinion continued:

"The Court's 1949 *Larson* decision makes it unnecessary, however, to undertake that task here.   For in *Larson* the Court, aware that it was called upon to 'resolve the conflict in doctrine' . . . , thoroughly reviewed the many prior decisions, and made an informed and carefully considered choice between the seemingly conflicting precedents."   *Ibid.*

The Court included many of the cases upon which the dissent relies in its list of cases that were rejected by *Larson*.   See 369 U. S., at 646, n. 6.

[27] *E. g.*, *Rolston* v. *Missouri Fund Commissioners*, 120 U. S. 390 (1887) (never cited); *Scully* v. *Bird*, 209 U. S. 481 (1908) (never cited); *Hopkins* v. *Clemson Agricultural College*, 221 U. S. 636 (1911) (never cited); *Johnson* v. *Lankford*, 245 U. S. 541 (1918) (never cited); *Land* v. *Dollar*, 330 U. S. 731 (1947) (cited only for proposition that judgment that would expend itself on public treasury or interfere with public administration is a suit against the United States); *Cunningham* v. *Macon & Brunswick R. Co.*, 109 U. S. 446 (1883) (cited only for proposition that a suit alleging unconstitutional conduct is not barred by the Eleventh Amendment, and that State cannot be sued without its consent); *Poindexter* v. *Greenhow*, 114 U. S. 270 (1885) (unconstitutional-conduct suit is not suit against State); *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362 (1894) (same).   Prior to *Florida Dept. of State* v. *Treasure Salvors, Inc.*, *supra*, *Tindal* v. *Wesley*, 167 U. S. 204 (1897), had been cited only for the proposition that a suit alleging unconstitutional conduct is not barred by the Eleventh Amend-

if it ever was accepted to the full extent to which it is now pressed, has not been the law for at least a generation.

The reason is obvious. Under the dissent's view of the ultra vires doctrine, the Eleventh Amendment would have force only in the rare case in which a plaintiff foolishly attempts to sue the State in its own name, or where he cannot produce some state statute that has been violated to his asserted injury. Thus, the ultra vires doctrine, a narrow and questionable exception, would swallow the general rule that a suit is against the State if the relief will run against it. That result gives the dissent no pause presumably because of its view that the Eleventh Amendment and sovereign immunity "'undoubtedly ru[n] counter to modern democratic notions of the moral responsibility of the State.'" *Post*, at 164, n. 48 (quoting *Great Northern Life Insurance Co.* v. *Read*, 322 U. S. 47, 59 (1944) (Frankfurter, J., dissenting)). This argument has not been adopted by this Court. See *Great Northern Life Insurance Co.* v. *Read, supra*, at 51 ("Efforts to force, through suits against officials, performance of promises by a state collide directly with the necessity that a sovereign must be free from judicial compulsion in the carrying out of its policies within the limits of the Constitution"); *Larson*, 337 U. S., at 704 ("The Government, as representative of the community as a whole, cannot be stopped in its tracks . . ."). Moreover, the argument substantially misses the point with respect to Eleventh Amendment sovereign immunity. As JUSTICE MARSHALL has observed, the Eleventh Amendment's restriction on the federal judicial power is based in large part on "the problems of federalism inherent in making

---

ment. The plurality opinion in *Treasure Salvors* discussed *Tindal* at some length, 458 U. S., at 685–688, but noted that the rule of *Tindal* "was clarified in *Larson*." 458 U. S., at 688; see also *id.*, at 715, n. 13 (WHITE, J., concurring in judgment in part and dissenting in part).

As noted, n. 26, *supra*, some of these cases were also cited—and rejected—in *Malone* v. *Bowdoin, supra*, at 646, n. 6.

one sovereign appear against its will in the courts of the other." *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S., at 294 (concurring in result). The dissent totally rejects the Eleventh Amendment's basis in federalism.

## C

The reasoning of our recent decisions on sovereign immunity thus leads to the conclusion that a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself. In reaching a contrary conclusion, the Court of Appeals relied principally on a separate line of cases dealing with pendent jurisdiction. The crucial point for the Court of Appeals was that this Court has granted relief against state officials on the basis of a pendent state-law claim. See 673 F. 2d, at 657–658. We therefore must consider the relationship between pendent jurisdiction and the Eleventh Amendment.

This Court long has held generally that when a federal court obtains jurisdiction over a federal claim, it may adjudicate other related claims over which the court otherwise would not have jurisdiction. See, *e. g.*, *Mine Workers* v. *Gibbs*, 383 U. S. 715, 726 (1966); *Osborn* v. *Bank of United States*, 9 Wheat. 738, 819–823 (1824). The Court also has held that a federal court may resolve a case solely on the basis of a pendent state-law claim, see *Siler*, 213 U. S., at 192–193, and that in fact the court usually should do so in order to avoid federal constitutional questions, see *id.*, at 193; *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter"). But pendent jurisdiction is a judge-made doctrine inferred from the general language of Art. III. The question presented is whether this doctrine

may be viewed as displacing the explicit limitation on federal jurisdiction contained in the Eleventh Amendment.

As the Court of Appeals noted, in *Siler* and subsequent cases concerning pendent jurisdiction, relief was granted against state officials on the basis of state-law claims that were pendent to federal constitutional claims. In none of these cases, however, did the Court so much as mention the Eleventh Amendment in connection with the state-law claim. Rather, the Court appears to have assumed that once jurisdiction was established over the federal-law claim, the doctrine of pendent jurisdiction would establish power to hear the state-law claims as well. The Court has not addressed whether that doctrine has a different scope when applied to suits against the State. This is illustrated by *Greene* v. *Louisville & Interurban R. Co.*, 244 U. S. 499 (1917), in which the plaintiff railroads sued state officials, alleging that certain tax assessments were excessive under the Fourteenth Amendment. The Court first rejected the officials' argument that the Eleventh Amendment barred the federal constitutional claim. It held that *Ex parte Young* applied to all allegations challenging the constitutionality of official action, regardless of whether the state statute under which the officials purported to act was constitutional or unconstitutional. See 244 U. S., at 507. Having determined that the Eleventh Amendment did not deprive the federal court of jurisdiction over the Fourteenth Amendment question, the Court declared that the court's jurisdiction extended "to the determination of all questions involved in the case, including questions of state law, irrespective of the disposition that may be made of the federal question, or whether it be found necessary to decide it at all." *Id.*, at 508. The case then was decided solely on state-law grounds. Accord, *Louisville & Nashville R. Co.* v. *Greene*, 244 U. S. 522 (1917).[28]

---

[28] The case was argued in the same way. The Eleventh Amendment argument in the briefs is confined to the federal constitutional claims. See, *e. g.*, Brief for Louisville & Nashville R. Co., O. T. 1916, Nos. 778, 779, pp. 15–38 (jurisdiction over federal claims); *id.*, at 38–39 (pendent juris-

These cases thus did not directly confront the question before us. "[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." *Hagans* v. *Lavine*, 415 U. S. 528, 533, n. 5 (1974).[29] We therefore view the question as an open one.

As noted, the implicit view of these cases seems to have been that once jurisdiction is established on the basis of a federal question, no further Eleventh Amendment inquiry is necessary with respect to other claims raised in the case. This is an erroneous view and contrary to the principles established in our Eleventh Amendment decisions. "The Eleventh Amendment is an explicit limitation of the judicial power of the United States." *Missouri* v. *Fiske*, 290 U. S., at 25. It deprives a federal court of power to decide certain claims against States that otherwise would be within the

---

diction over state claims). Indeed the State's brief somewhat curiously closes with a concession that the federal courts had jurisdiction. Brief for State Board and Officers, O. T. 1916, Nos. 778, 779, p. 139; see Reply Brief, O. T. 1916, Nos. 778, 779, p. 2 (pointing out concession). Thus, while the State's position on the Court's jurisdiction over the federal claims is somewhat unclear, the State never argued that there might not be jurisdiction over the local-law claims if the Court found jurisdiction over the federal question in the case.

Nor do any of the other pendent-jurisdiction cases cited in JUSTICE STEVENS' dissent, *post*, at 166, n. 52, discuss the Eleventh Amendment in connection with the state-law claims. Moreover, since *Larson* was decided in 1949, making clear that mere violations of state law would not override the Eleventh Amendment, these cases have been cited only for the proposition that, as a general matter, a federal court should decide a case on state-law grounds where possible to avoid a federal constitutional question. Nothing in our decision is meant to cast doubt on the desirability of applying the *Siler* principle in cases where the federal court has jurisdiction to decide the state-law issues.

[29] See *Edelman* v. *Jordan*, 415 U. S., at 671 ("Having now had an opportunity to more fully consider the Eleventh Amendment issue after briefing and argument, we disapprove the Eleventh Amendment holdings of [certain prior] cases to the extent that they are inconsistent with our holding today").

scope of Art. III's grant of jurisdiction. For example, if a lawsuit against state officials under 42 U. S. C. § 1983 alleges a constitutional claim, the federal court is barred from awarding damages against the state treasury even though the claim arises under the Constitution. See *Quern* v. *Jordan,* 440 U. S. 332 (1979). Similarly, if a § 1983 action alleging a constitutional claim is brought directly against a State, the Eleventh Amendment bars a federal court from granting any relief on that claim. See *Alabama* v. *Pugh,* 438 U. S. 781 (1978) *(per curiam).* The Amendment thus is a specific constitutional bar against hearing even *federal* claims that otherwise would be within the jurisdiction of the federal courts.[30]

This constitutional bar applies to pendent claims as well. As noted above, pendent jurisdiction is a judge-made doctrine of expediency and efficiency derived from the general Art. III language conferring power to hear all "cases" arising under federal law or between diverse parties. See *Mine Workers* v. *Gibbs,* 383 U. S., at 725. See also *Hagans* v. *Lavine, supra,* at 545 (terming pendent jurisdiction "a doctrine of discretion"). The Eleventh Amendment should not be construed to apply with less force to this implied form of jurisdiction than it does to the explicitly granted power to hear federal claims. The history of the adoption and development of the Amendment, see *supra,* at 97–100, confirms that it is an independent limitation on all exercises of Art. III power: "the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given," *Ex parte State of New York,* 256 U. S., at 497. If we were to hold otherwise, a federal court could award damages against a State on the basis of a pendent claim. Our decision in

---

[30] See, *e. g., Monaco* v. *Mississippi,* 292 U. S., at 322 ("[A]lthough a case may arise under the Constitution and laws of the United States, the judicial power does not extend to it if the suit is sought to be prosecuted against a State, without her consent, by one of her own citizens"); *Missouri* v. *Fiske,* 290 U. S. 18, 25–26 (1933).

*Edelman* v. *Jordan* makes clear that pendent jurisdiction does not permit such an evasion of the immunity guaranteed by the Eleventh Amendment. We there held that "the District Court was correct in exercising pendent jurisdiction over [plaintiffs'] statutory claim," 415 U. S., at 653, n. 1, but then concluded that the Eleventh Amendment barred an award of retroactive relief on the basis of that pendent claim. *Id.*, at 678.

In sum, contrary to the view implicit in decisions such as *Greene* v. *Louisville & Interurban R. Co.*, 244 U. S. 499 (1917), neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment.[31] A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment. We concluded above that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment. See *supra*, at 106. We now hold that this principle applies as well to state-law claims brought into federal court under pendent jurisdiction.

## D

Respondents urge that application of the Eleventh Amendment to pendent state-law claims will have a disruptive effect on litigation against state officials. They argue that the "considerations of judicial economy, convenience, and fairness to litigants" that underlie pendent jurisdiction, see *Gibbs*, *supra*, at 726, counsel against a result that may cause litigants to split causes of action between state and federal courts. They also contend that the policy of avoiding unnecessary constitutional decisions will be contravened if plaintiffs choose to forgo their state-law claims and sue only in federal court or, alternatively, that the policy of *Ex parte Young*

---

[31] See *Missouri* v. *Fiske*, *supra*, at 27 ("This is not less a suit against the State because the bill is ancillary and supplemental").

will be hindered if plaintiffs choose to forgo their right to a federal forum and bring all of their claims in state court.

It may be that applying the Eleventh Amendment to pendent claims results in federal claims being brought in state court, or in bifurcation of claims. That is not uncommon in this area. Under *Edelman v. Jordan, supra,* a suit against state officials for retroactive monetary relief, whether based on federal or state law, must be brought in state court. Challenges to the validity of state tax systems under 42 U. S. C. § 1983 also must be brought in state court. *Fair Assessment in Real Estate Assn., Inc.* v. *McNary,* 454 U. S. 100 (1981). Under the abstention doctrine, unclear issues of state law commonly are split off and referred to the state courts.[32]

---

[32] Moreover, allowing claims against state officials based on state law to be brought in the federal courts does not necessarily foster the policies of "judicial economy, convenience and fairness to litigants," *Mine Workers* v. *Gibbs,* 383 U. S. 715, 726 (1966), on which pendent jurisdiction is founded. For example, when a federal decision on state law is obtained, the federal court's construction often is uncertain and ephemeral. In cases of ongoing oversight of a state program that may extend over years, as in this case, the federal intrusion is likely to be extensive. Duplication of effort, inconvenience, and uncertainty may well result. See, *e. g., Burford* v. *Sun Oil Co.,* 319 U. S. 315, 327 (1943) ("Delay, misunderstanding of local law, and needless federal conflict with the state policy, are the inevitable product of this double [*i. e.,* federal-state] system of review"). This case is an example. Here, the federal courts effectively have been undertaking to operate a major state institution based on inferences drawn from dicta in a state-court opinion not decided until four years after the suit was begun. The state court has had no opportunity to review the federal courts' construction of its opinion, or their choice of remedies. The only sure escape from an erroneous interpretation of state law is presumably the rather cumbersome route of legislation.

Waste and delay may also result from abstention, which often is called for when state law is unclear, see *Baggett* v. *Bullitt,* 377 U. S. 360, 378–379 (1964) ("abstention operates to require piecemeal adjudication in many courts, thereby delaying ultimate adjudication on the merits for an undue length of time") (citations omitted), or from dismissals on the basis of comity, which has special force when relief is sought on state-law grounds, see *Gibbs, supra,* at 726; *Hawks* v. *Hamill,* 288 U. S. 52, 61 (1933).

In any case, the answer to respondents' assertions is that such considerations of policy cannot override the constitutional limitation on the authority of the federal judiciary to adjudicate suits against a State. See *Missouri* v. *Fiske*, 290 U. S., at 25–26 ("Considerations of convenience open no avenue of escape from the [Amendment's] restriction").[33] That a litigant's choice of forum is reduced "has long been understood to be a part of the tension inherent in our system of federalism." *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S., at 298 (MARSHALL, J., concurring in result).

## IV

Respondents contend that, regardless of the applicability of the Eleventh Amendment to their state claims against petitioner state officials, the judgment may still be upheld against petitioner *county* officials. We are not persuaded. Even assuming that these officials are not immune from suit challenging their actions under the MH/MR Act,[34] it is clear

---

[33] Cf. *Aldinger* v. *Howard*, 427 U. S. 1, 14–15 (1976) (Although "considerations of judicial economy" would be served by permitting pendent-party jurisdiction, "the addition of a completely new party would run counter to the well-established principle that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress").

[34] We have held that the Eleventh Amendment does not apply to "counties and similar municipal corporations." *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 280 (1977); see *Lincoln County* v. *Luning*, 133 U. S. 529, 530 (1890). At the same time, we have applied the Amendment to bar relief against county officials "in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself." *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 401 (1979). See, *e. g.*, *Edelman* v. *Jordan*, 415 U. S. 651 (1974) (Eleventh Amendment bars suit against state and county officials for retroactive award of welfare benefits). The Courts of Appeals are in general agreement that a suit against officials of a county or other governmental entity is barred if the relief obtained runs against the State. See, *e. g.*, *Moore* v. *Tangipahoa Parish School Board*, 594 F. 2d 489, 493 (CA5 1979); *Carey* v. *Quern*, 588 F. 2d 230, 233–234 (CA7 1978); *Incarcerated Men of Allen County Jail* v. *Fair*, 507

that without the injunction against the state institutions and officials in this case, an order entered on state-law grounds necessarily would be limited. The relief substantially concerns Pennhurst, an arm of the State that is operated by state officials. Moreover, funding for the county mental retardation programs comes almost entirely from the State, see Pa. Stat. Ann., Tit. 50, §§ 4507–4509 (Purdon 1969 and Supp. 1983–1984), and the costs of the Masters have been borne by the State, see 446 F. Supp., at 1327. Finally, the MH/MR Act contemplates that the state and county officials will cooperate in operating mental retardation programs. See *In re Schmidt*, 494 Pa., at 95–96, 429 A. 2d, at 635–636. In short, the present judgment could not be sustained on the basis of the state-law obligations of petitioner county officials. Indeed, any relief granted against the county officials on the basis of the state statute would be partial and incomplete at best. Such an ineffective enforcement of state law would not appear to serve the purposes of efficiency, convenience, and fairness that must inform the exercise of pendent jurisdiction.

V

The Court of Appeals upheld the judgment of the District Court solely on the basis of Pennsylvania's MH/MR Act. We hold that these federal courts lacked jurisdiction to enjoin petitioner state institutions and state officials on the basis of

---

F. 2d 281, 287–288 (CA6 1974); *Harris* v. *Tooele County School District*, 471 F. 2d 218, 220 (CA10 1973). Given that the actions of the county commissioners and mental-health administrators are dependent on funding from the State, it may be that relief granted against these county officials, when exercising their functions under the MH/MR Act, effectively runs against the State. Cf. *Farr* v. *Chesney*, 441 F. Supp. 127, 130–132 (MD Pa. 1978) (holding that Pennsylvania county commissioners, acting as members of the board of the county office of mental health and retardation, may not be sued for backpay under the Eleventh Amendment). We need not decide this issue in light of our disposition above.

this state law.   The District Court also rested its decision on the Eighth and Fourteenth Amendments and § 504 of the Rehabilitation Act of 1973.   See *supra*, at 93.   On remand the Court of Appeals may consider to what extent, if any, the judgment may be sustained on these bases.[35]   The court also may consider whether relief may be granted to respondents under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. §§ 6011, 6063 (1976 ed. and Supp. V). The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, dissenting.

I fully agree with JUSTICE STEVENS' dissent.   Nevertheless, I write separately to explain that in view of my continued belief that the Eleventh Amendment "bars federal court suits against States only by citizens of other States," *Yeomans* v. *Kentucky*, 423 U. S. 983, 984 (1975) (BRENNAN, J., dissenting), I would hold that petitioners are not entitled to invoke the protections of that Amendment in this federal-court suit by citizens of Pennsylvania.   See *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279, 298 (1973) (BRENNAN, J., dissenting); *Edelman* v. *Jordan*, 415 U. S. 651, 687 (1974) (BRENNAN, J., dissenting).   In my view, *Hans* v. *Louisiana*, 134 U. S. 1 (1890), upon which the Court today relies, *ante*, at 98, recognized that the Eleventh Amendment, by its terms, erects a limited constitutional barrier prohibiting suits against States by citizens of another State; the decision, however, "accords to nonconsenting States only a *nonconstitutional* immunity from suit by its own citizens."   *Employees* v. *Missouri Dept. of Public*

---

[35] On the Fourteenth Amendment issue, the court should consider *Youngberg* v. *Romeo*, 457 U. S. 307 (1982), a decision that was not available when the District Court issued its decision.

*Health and Welfare, supra,* at 313 (BRENNAN, J., dissenting) (emphasis added). For scholarly discussions supporting this view, see Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889, 1893–1894 (1983); Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part One, 126 U. Pa. L. Rev. 515, 538–540, and n. 88 (1978). To the extent that such nonconstitutional sovereign immunity may apply to petitioners, I agree with JUSTICE STEVENS that since petitioners' conduct was prohibited by state law, the protections of sovereign immunity do not extend to them.

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

This case has illuminated the character of an institution. The record demonstrates that the Pennhurst State School and Hospital has been operated in violation of state law. In 1977, after three years of litigation, the District Court entered detailed findings of fact that abundantly support that conclusion. In 1981, after four more years of litigation, this Court ordered the United States Court of Appeals for the Third Circuit to decide whether the law of Pennsylvania provides an independent and adequate ground which can support the District Court's remedial order. The Court of Appeals, sitting en banc, unanimously concluded that it did. This Court does not disagree with that conclusion. Rather, it reverses the Court of Appeals because it did precisely what this Court ordered it to do; the only error committed by the Court of Appeals was its faithful obedience to this Court's command.

This remarkable result is the product of an equally remarkable misapplication of the ancient doctrine of sovereign immunity. In a completely unprecedented holding, today the Court concludes that Pennsylvania's sovereign immunity prevents a federal court from enjoining the conduct that Pennsylvania itself has prohibited. No rational view of the sovereign immunity of the States supports this result. To the

contrary, the question whether a federal court may award injunctive relief on the basis of state law has been answered affirmatively by this Court many times in the past. Yet the Court repudiates at least 28 cases, spanning well over a century of this Court's jurisprudence, proclaiming instead that federal courts have no power to enforce the will of the States by enjoining conduct because it violates state law. This new pronouncement will require the federal courts to decide federal constitutional questions despite the availability of state-law grounds for decision, a result inimical to sound principles of judicial restraint. Nothing in the Eleventh Amendment, the conception of state sovereignty it embodies, or the history of this institution, requires or justifies such a perverse result.

I

The conduct of petitioners that the Court attributes to the State of Pennsylvania in order to find it protected by the Eleventh Amendment is described in detail in the District Court's findings. As noted in our prior opinion, *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), and by the majority today, *ante,* at 92–93, those findings were undisputed: "Conditions at Pennhurst are not only dangerous, with the residents often physically abused or drugged by staff members, but also inadequate for the 'habilitation' of the retarded. Indeed, the court found that the physical, intellectual, and emotional skills of some residents have deteriorated at Pennhurst." 451 U. S., at 7 (footnote omitted). The court concluded that Pennhurst was actually hazardous to its residents.[1] Organized programs of training or educa-

---

[1] Infectious diseases were common and minimally adequate health care was unavailable. Residents of Pennhurst were inadequately supervised, and as a consequence were often injured by other residents or as a result of self-abuse. Assaults on residents by staff members, including sexual assaults, were frequent. Physical restraints were employed in lieu of adequate staffing, often causing injury to residents, and on one occasion leading to a death. Dangerous psychotropic drugs were indiscriminately used for purposes of behavior control and staff convenience. Staff supervision

tion were inadequate or entirely unavailable, and programs of treatment or training were not developed for residents. When they visited Pennhurst, shocked parents of residents would find their children bruised, drugged, and unattended. These conditions often led to a deterioration in the condition of the residents after being placed in Pennhurst. Terri Lee Halderman, for example, was learning to talk when she entered Pennhurst; after residing there she lost her verbal skills. At every stage of this litigation, petitioners have conceded that Pennhurst fails to provide even minimally adequate habilitation for its residents. See *Halderman* v. *Pennhurst State School and Hospital*, 612 F. 2d 84, 92–94 (CA3 1979) (en banc); 446 F. Supp. 1295, 1304 (ED Pa. 1977).

The District Court held that these conditions violated each resident's rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, 29 U. S. C. § 794, and the Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa. Stat. Ann., Tit. 50, §§ 4101–4704 (Purdon 1969 and Supp. 1983–1984) (MH/MR Act). The en banc Court of Appeals for the Third Circuit affirmed most of the District Court's judgment, but it grounded its decision solely on the "bill of rights" provision in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6010. The court did not consider the constitutional issues or § 504 of the Rehabilitation Act. While it affirmed the District Court's holding that the MH/MR Act provides a right to adequate habilitation, the court did not decide whether that state right justified all of the relief granted by the District Court.

Petitioners sought review by this Court, asserting that the Court of Appeals had erred in its construction of both federal and state statutes. This Court granted certiorari and re-

---

during meals was minimal, and residents often stole food from each other— leaving some without enough to eat. The unsafe conditions led to aggressive behavior on the part of residents which was punished by solitary confinement. There was often urine and excrement on the walls.

versed, 451 U. S. 1 (1981), holding that 42 U. S. C. § 6010 created no substantive rights. We did not accept respondents' state-law contention, because there was a possibility that the Court of Appeals' analysis of the state statute had been influenced by its erroneous reading of federal law. Concluding that it was "unclear whether state law provides an independent and adequate ground which can support the court's remedial order," 451 U. S., at 31, we "remand[ed] the state-law issue for reconsideration in light of our decision here." *Ibid.* In a footnote we declined to consider the effect of the Pennsylvania Supreme Court's then recent decision, *In re Schmidt,* 494 Pa. 86, 429 A. 2d 631 (1981), on the state-law issues in the case, expressly stating that on remand the Court of Appeals could "consider the state-law issues in light of the Pennsylvania Supreme Court's recent decision." 451 U. S., at 31, n. 24.

On remand, 673 F. 2d 647 (CA3 1982) (en banc), the Court of Appeals, noting that this Court had remanded for reconsideration of the state-law issue, examined the impact of *Schmidt.*[2] According to the Court of Appeals, which was unanimous on this point, the State Supreme Court had "spoken definitively" on the duties of the State under the MH/MR Act, holding that the State was required to provide care to the mentally retarded in the "least restrictive environment." 673 F. 2d, at 651. Since the MH/MR Act fully justified the relief issued in the Court of Appeals' prior judgment, the court reinstated its prior judgment on the basis of petitioners' violation of state law.[3]

---

[2] In the questions raised in their petition for certiorari, petitioners do not ask this Court to reexamine the Court of Appeals' conclusion that respondents are clearly entitled to relief under state law. Nor would it be appropriate for this Court to reexamine the unanimous conclusion of the en banc Court of Appeals on a question of state law. See, *e. g., Bishop* v. *Wood,* 426 U. S. 341, 345–346 (1976).

[3] The court therefore found it unnecessary to decide if respondents were also entitled to relief under the federal statutory and constitutional provisions which had been raised in the District Court.

Thus, the District Court found that petitioners have been operating the Pennhurst facility in a way that is forbidden by state law, by federal statute, and by the Federal Constitution. The en banc Court of Appeals for the Third Circuit unanimously concluded that state law provided a clear and adequate basis for upholding the District Court and that it was not necessary to address the federal questions decided by that court. That action conformed precisely to the directive issued by this Court when the case was here before. Petitioners urge this Court to make an unprecedented about-face, and to hold that the Eleventh Amendment prohibited the Court of Appeals from doing what this Court ordered it to do when we instructed it to decide whether respondents were entitled to relief under state law. Of course, if petitioners are correct, then error was committed not by the Court of Appeals, which after all merely obeyed the instruction of this Court, but rather by this Court in 1981 when we ordered the Court of Appeals to consider the state-law issues in the case.

Petitioners' position is utterly without support. The Eleventh Amendment and the doctrine of sovereign immunity it embodies have never been interpreted to deprive a court of jurisdiction to grant relief against government officials who are engaged in conduct that is forbidden by their sovereign. On the contrary, this Court has repeatedly and consistently exercised the power to enjoin state officials from violating state law.[4]

## II

The majority proceeds as if this Court has not had previous occasion to consider the Eleventh Amendment argument made by petitioners, and contends that *Ex parte Young*, 209 U. S. 123 (1908), has no application to a suit seeking injunctive relief on the basis of state law. That is simply not the case. The Court rejected the argument that the Eleventh

---

[4] Although the Court struggles mightily to distinguish some of the cases that foreclose its holding today, see *ante*, at 106–116, this vain effort merely brings into stark relief the total absence of any affirmative support for its holding.

Amendment precludes injunctive relief on the basis of state law twice only two Terms ago. In *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982), four Justices concluded that a suit for possession of property in the hands of state officials was not barred by the Eleventh Amendment inasmuch as the State did not have even a colorable claim to the property under state law. See *id.*, at 696–697 (opinion of STEVENS, J., joined by BURGER, C. J., and MARSHALL and BLACKMUN, JJ.). Four additional Justices accepted the proposition that if the state officers' conduct had been in violation of a state statute, the Eleventh Amendment would not bar the action. *Id.*, at 714 (WHITE, J., concurring in judgment in part and dissenting in part, joined by POWELL, REHNQUIST, and O'CONNOR, JJ.).[5] And in just one short paragraph in *Cory* v. *White*, 457 U. S. 85 (1982), the Court thrice restated the settled rule that the Eleventh Amendment does not bar suits against state officers when they are "alleged to be acting against federal or state law."[6] These

---

[5] "*Larson* [v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682 (1949),] established that where the officer's actions are limited by statute, actions beyond those limitations are to be considered individual and not sovereign actions." 458 U. S., at 714.

[6] "Neither did *Edelman* [v. *Jordan*, 415 U. S. 651 (1974),] deal with a suit naming a state officer as defendant, but not *alleging a violation of either federal or state law*. Thus, there was no occasion in the opinion to cite or discuss the unanimous opinion in *Worcester* [*County Trust Co.* v. *Riley*, 302 U. S. 292 (1937),] that the Eleventh Amendment bars suits against state officers *unless they are alleged to be acting contrary to federal law or against the authority of state law*. *Edelman* did not hold that suits against state officers who are *not alleged to be acting against federal or state law* are permissible under the Eleventh Amendment if only prospective relief is sought." 457 U. S., at 91 (emphasis supplied).

See also *Worcester County Trust Co.* v. *Riley*, 302 U. S. 292, 297 (1937) ("[G]enerally suits to restrain action of state officials can, consistently with the constitutional prohibition, be prosecuted only when the action sought to be restrained is without the authority of state law or contravenes the statutes or Constitution of the United States. The Eleventh Amendment, which denies to the citizen the right to resort to a federal court to compel or restrain state action, does not preclude suit

are only the two most recent in an extraordinarily long line of cases.

By 1908, it was firmly established that conduct of state officials under color of office that is tortious as a matter of state law is not protected by the Eleventh Amendment. See *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 390–391 (1894); *Poindexter* v. *Greenhow*, 114 U. S. 270, 287 (1885); *Cunningham* v. *Macon & Brunswick R. Co.*, 109 U. S. 446, 452 (1883).[7] Cf. *Belknap* v. *Schild*, 161 U. S. 10, 18 (1896) (same rule adopted for sovereign immunity of the United States); *Stanley* v. *Schwalby*, 147 U. S. 508, 518–519 (1893) (same).[8] In *Hopkins* v. *Clemson Agricultural College*, 221

---

against a wrongdoer merely because he asserts that his acts are within an official authority which the state does not confer" (citations omitted)). In *Worcester* the Court held a suit barred by the Eleventh Amendment only after stating: "Hence, it cannot be said that the threatened action of respondents involves any breach of state law or of the laws or Constitution of the United States." *Id.*, at 299.

[7] The Court explained that the state officer sued in tort "is not sued as, or because he is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he *asserts* authority as such officer. To make out his defence he must show that his authority was sufficient in law to protect him." *Cunningham*, 109 U. S., at 452, quoted in *Poindexter*, 114 U. S., at 287. Today's majority notes that these cases involve nondiscretionary duties of governmental officers, *ante*, at 109–110, but overlooks the reason for this characterization—officers have no discretion to commit a tort. The same is true of the Court's treatment of the federal sovereign immunity cases I discuss below.

[8] See also *Butz* v. *Economou*, 438 U. S. 478, 489–490 (1978) (officers of the United States are liable for their torts unless the torts are authorized by federal law); *Philadelphia Co.* v. *Stimson*, 223 U. S. 605, 619–620 (1912) (officers of the United States may be enjoined where they wrongfully interfere with property rights). Justice Holmes had occasion to state that sovereign immunity does not generally extend to the acts of an officer of the sovereign. "In general the United States cannot be sued for a tort, but its immunity does not extend to those that acted in its name." *Sloan Shipyards Corp.* v. *United States Shipping Bd. Emergency Fleet Corp.*, 258 U. S. 549, 568 (1922). He characterized petitioner's argument in that case—that sovereign immunity should extend to the unlawful acts of agents of the United States acting within the scope of their authority—as "a very dangerous departure from one of the first principles of our system

U. S. 636 (1911), the Court explained the relationship of these cases to the doctrine of sovereign immunity.

> "[I]mmunity from suit is a high attribute of sovereignty—a prerogative of the State itself—which cannot be availed of by public agents when sued for their own torts.   The Eleventh Amendment was not intended to afford them freedom from liability in any case where, under color of their office, they have injured one of the State's citizens.   To grant them such immunity would be to create a privileged class free from liability for wrongs inflicted or injuries threatened. . . .
>
> ". . . Besides, neither a State nor an individual can confer upon an agent authority to commit a tort so as to excuse the perpetrator.   In such cases the law of agency has no application—the wrongdoer is treated as a principal and individually liable for the damages inflicted and subject to injunction against the commission of acts causing irreparable injury."   *Id.*, at 642–643.[9]

---

of law.   The sovereign properly so called is superior to suit for reasons that often have been explained.   But the general rule is that any person within the jurisdiction always is amenable to the law. . . . An instrumentality of government he might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts."   *Id.*, at 566–567.   See also *Brady* v. *Roosevelt S.S. Co.*, 317 U. S. 575 (1943) (following *Sloan*).

[9] The Court also stated:

"Corporate agents or individual officers of the State stand in no better position than officers of the General Government, and as to them it has often been held that: 'The exemption of the United States from judicial process does not protect their officers and agents, civil or military, in time of peace, from being personally liable to an action of tort by a private person, whose rights of property they have wrongfully invaded or injured, *even by authority of the United States.*'   *Belknap* v. *Schild*, 161 U. S. 10, 18."   221 U. S., at 645 (emphasis supplied).

The language I have quoted in the text makes it clear that the Court is incorrect to suggest *ante*, at 109–110, n. 19, that *Clemson* dealt only with unconstitutional conduct and not with conduct in violation of state tort law. See also *Old Colony Trust Co.* v. *Seattle*, 271 U. S. 426, 431 (1926) (re-

The principles that were decisive in these cases are not confined to actions under state tort law. They also apply to claims that state officers have violated state statutes. In *Johnson* v. *Lankford*, 245 U. S. 541 (1918), the Court reversed the dismissal of an action against the bank commissioner of Oklahoma and his surety to recover damages for the loss of plaintiff's bank deposit, allegedly caused by the commissioner's failure to safeguard the business and assets of the bank in negligent or willful disregard of his duties under applicable state statutes. The Court explained that the action was not one against the State.

> "To answer it otherwise would be to assert, we think, that whatever an officer does, even in contravention of the laws of the State, is state action, identifies him with it and makes the redress sought against him a claim against the State and therefore prohibited by the Eleventh Amendment. Surely an officer of a State may be delinquent without involving the State in delinquency, indeed, may injure the State by delinquency as well as some resident of the State, and be amenable to both." *Id.*, at 545.

Similarly, in *Rolston* v. *Missouri Fund Commissioners*, 120 U. S. 390 (1887), the Court rejected the argument that a suit to enjoin a state officer to comply with state law violated the Eleventh Amendment. The Court wrote: "Here the suit is to get a state officer to do what a statute requires of him. The litigation is with the officer, not the state." *Id.*, at 411.[10]

---

affirming the rationale of *Clemson* in an action against city and county officials).

[10] In *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362 (1894), the Court held that the Eleventh Amendment does not bar a suit alleging that a state officer has wrongfully administered a state statute. The Court awarded injunctive relief against state officers on the basis of both state and federal law. In *Atchison, T. & S. F. R. Co.* v. *O'Connor*, 223 U. S. 280 (1912), the Court held that a suit against state officers seeking recovery of taxes paid under duress was not against the State since a state statute required the recovery of wrongfully paid taxes. See *id.*, at 287. In

Significantly, this rule was expressly reaffirmed in a case decided by this Court in the same Term as *Ex parte Young* and published in the same volume of the United States Re-

*Lankford* v. *Platte Iron Works Co.*, 235 U. S. 461 (1915), the Court assumed that the Eleventh Amendment would not bar a suit "to compel submission by the officers of the State to the laws of the State, accomplishing at once the policy of the law and its specific purpose," *id.*, at 471, but rejected the appellees' construction of the state statute. See also *Farish* v. *State Banking Board of Okla.*, 235 U. S. 498 (1915); *American Water Softener Co.* v. *Lankford*, 235 U. S. 496 (1915). In *Martin* v. *Lankford*, 245 U. S. 547 (1918), the Court stated that the case was not barred by the Eleventh Amendment since the claim "is based, as we have seen, upon the tortious conduct of Lankford, not in exertion of the state law but in violation of it. The reasoning of [*Johnson* v. *Lankford*, 245 U. S. 541 (1918),] is therefore applicable and the conclusion must be the same, that is, the action is not one against the State, and the District Court erred in dismissing it for want of jurisdiction on that ground." *Id.*, at 551. While it is true, as the Court points out *ante*, at 109, n. 19, that the *Martin* Court went on to hold that there was no federal diversity jurisdiction over the case, it cannot be denied that the majority today repudiates the reasoning of *Martin*. As for the Court's treatment of *Johnson* v. *Lankford* and *O'Connor*, *ante*, at 109–110, n. 19, it is true that Johnson sought only damages, but the holding of that case, that the action was not barred by the Constitution since it alleged conduct in violation of state law, is utterly at odds with the Court's decision today. Surely the Court cannot mean to rely on a distinction between damages and injunctive relief, for it states: "A federal court's grant of relief against state officers on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. . . . We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law." *Ante*, at 106. Awarding damages for a violation of state law by state officers acting within their authority is inconsistent with the majority's position that only a need to vindicate federal law justifies the lifting of the Eleventh Amendment bar. If an order to pay damages for wrongful conduct against a state officer is not against the State for purposes of the Eleventh Amendment, an additional order in the form of an injunction telling the officer not to do it again is no more against the State. It cannot be doubted that today's decision overrules *Johnson*. Finally, as for *O'Connor*, while it involved an allegation of unconstitutional action, that allegation was insufficient to lift the bar of the Eleventh Amendment because the complaint sought retroactive relief. It was the fact that relief was authorized by state law that defeated the Eleventh Amendment claim in *O'Connor*. See 223 U. S., at 287.

ports.   The appellants in *Scully* v. *Bird*, 209 U. S. 481 (1908), brought a diversity suit seeking injunctive relief against the dairy and food commissioner of the State of Michigan, on the ground that "under cover of his office" he had maliciously engaged in a course of conduct designed to ruin plaintiffs' business in the State.   The Circuit Court dismissed the complaint on Eleventh Amendment grounds.   On appeal, the plaintiffs contended that the Eleventh Amendment "does not apply where a suit is brought against defendants who, claiming to act as officers of the State, and under color of a statute which is valid and constitutional, but wrongfully administered by them, commit, or threaten to commit, acts of wrong or injury to the rights and property of the plaintiff, or make such administration of the statute an illegal burden and exaction upon the plaintiff." *Ibid.*   This Court agreed.   It noted that the complaint alleged action "in dereliction of duties enjoined by the statutes of the State," and concluded that it was "manifest from this summary of the allegations of the bill that this is not a suit against the State." *Id.*, at 490.[11]

Finally, in *Greene* v. *Louisville & Interurban R. Co.*, 244 U. S. 499 (1917), and its companion cases, *Louisville & Nashville R. Co.* v. *Greene*, 244 U. S. 522 (1917); *Illinois Central R. Co.* v. *Greene*, 244 U. S. 555 (1917), the plaintiffs challenged the conduct of state officials under both federal and state law.   The Court, citing, *inter alia, Young* and *Clemson*, held that the Eleventh Amendment did not bar injunctive relief on the basis of state law, noting that the plaintiffs' federal claim was sufficiently substantial to justify the exer-

---

[11] Cases construing the sovereign immunity of the Federal Government also hold that conduct by federal officers forbidden by statute is not shielded by sovereign immunity even though the officer is not acting completely beyond his authority.   See *Land* v. *Dollar*, 330 U. S. 731 (1947); *Ickes* v. *Fox*, 300 U. S. 82 (1937); *Work* v. *Louisiana*, 269 U. S. 250 (1925); *Santa Fe Pacific R. Co.* v. *Fall*, 259 U. S. 197 (1922); *Payne* v. *Central Pacific R. Co.*, 255 U. S. 228 (1921); *Waite* v. *Macy*, 246 U. S. 606 (1918).

cise of pendent jurisdiction over plaintiffs' state-law claims,[12] and that since violations of federal and state law had been alleged, it was appropriate for the federal court to issue injunctive relief on the basis of state law without reaching the federal claims, despite the strictures of the Eleventh Amendment. In short, the *Greene* Court approved of precisely the methodology employed by the Court of Appeals in this case.[13]

None of these cases contain only "implicit" or *sub silentio* holdings; all of them explicitly consider and reject the claim that the Eleventh Amendment prohibits federal courts from issuing injunctive relief based on state law. There is therefore no basis for the majority's assertion that the issue presented by this case is an open one, *ante*, at 119.[14]

---

[12] The Court cited *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175 (1909), which will be discussed in Part IV, *infra*, in support of this proposition.

[13] The unanimous rejection of the argument that the Eleventh Amendment bars claims based on state officers' violations of federal statutes in *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 156, n. 6 (1978), is entirely consistent with my analysis of our cases. But under the majority's view, it represented a rather dramatic extension of *Ex parte Young* to encompass federal statutory claims as well as constitutional claims. *Ray* demonstrates that it cannot be maintained that *Young* and the other cases of this Court permit injunctive relief only when the constitutionality of state officers' conduct is at issue. If that were so *Ray* would be wrongly decided— an argument that a state officer has violated a federal statute does not constitute a challenge to the constitutionality of the officer's conduct. *Chapman* v. *Houston Welfare Rights Org.*, 441 U. S. 600, 612–615 (1979); *Swift & Co.* v. *Wickham*, 382 U. S. 111 (1965). In my view, the Eleventh Amendment claim in *Ray* deserved no more than the cursory footnote it received, since the state officials had engaged in conduct forbidden by statute. If the Court were willing to adhere to settled rules of law today, the Eleventh Amendment claim could be rejected just as summarily.

[14] The majority incredibly claims that *Greene* contains only an implicit holding on the Eleventh Amendment question the Court decides today. *Ante*, at 117–119. In plain words, the *Greene* Court held that the Eleventh Amendment did not bar consideration of the pendent state-law claims advanced in that case. The Court then considered and sustained those claims on their merits.

The Court tries to explain away these cases by arguing that the applicable state statutes gave petitioners such "broad discretion" over Pennhurst that their actions were not ultra vires, *ante*, at 110–111. The Court, however, does not dispute the Court of Appeals' conclusion that these state statutes gave petitioners *no discretion whatsoever* to disregard their duties with respect to institutionalization of the retarded as they did. Petitioners acted outside of their lawful discretion every bit as much as did the government officials in the cases I have discussed, which hold that when an official commits an act prohibited by law, he acts beyond his authority and is not protected by sovereign immunity.[15] After all, it is only common sense to conclude that States do not authorize their officers to violate their legal duties.

The Court also relies heavily on the fact that the District Court found petitioners immune from damages liability because they " 'acted in the utmost good faith . . . *within the sphere of their official responsibilities,* '" *ante*, at 107 (emphasis in original) (quoting 446 F. Supp., at 1324). This confuses two distinct concepts. An official can act in good faith and therefore be immune from damages liability despite the

---

[15] Contrary to the Court's treatment of them, the cases discussed above rely on the doctrine embraced in the quotation from *Clemson* I have set out—officials have no discretion to violate the law. The same is true of the federal sovereign immunity cases. See, *e. g., Land* v. *Dollar*, 330 U. S., at 736 ("the assertion by officers of the Government of their authority to act did not foreclose judicial inquiry into the lawfulness of their action [and] a determination of whether their 'authority is rightfully assumed is the exercise of jurisdiction, and must lead to the decision of the merits of the question' "); *Payne* v. *Central Pacific R. Co.*, 255 U. S., at 236 ("But of course [the Secretary of the Interior's statutory authority] does not clothe him with any discretion to enlarge or curtail the rights of the grantee, nor to substitute his judgment for the will of Congress as manifested in the granting act"); *Waite* v. *Macy*, 246 U. S., at 610 ("The Secretary [of the Treasury] and the board must keep within the statute . . . and we see no reason why the restriction should not be enforced by injunction . . ."); *Philadelphia Co.* v. *Stimson*, 223 U. S. 605, 620 (1912) ("And in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process").

fact that he has done that which the law prohibits, a point recognized as recently as *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982). Nevertheless, good-faith immunity from damages liability is irrelevant to the availability of injunctive relief. See *Wood* v. *Strickland*, 420 U. S. 308, 314–315, n. 6 (1975). The state officials acted in nothing less than good faith and within the sphere of their official responsibilities in asserting Florida's claim to the treasure in *Treasure Salvors;* the same can be said for the bank commissioner's actions in safeguarding bank deposits challenged in *Johnson* v. *Lankford,* the fund commissioner's decision to sell property mortgaged to the State challenged in *Rolston,* and the state food and dairy commissioner's decision to prosecute the appellant for violating the state food impurity Act challenged in *Scully,* to give just a few examples. Yet in each of these cases the state officers' conduct was enjoined. *Greene* makes this point perfectly clear. There state officers did nothing more than carry out responsibilities clearly assigned to them by a statute. Their conduct was neverthless enjoined because this Court held that their conduct violated the State Constitution, despite the fact that their reliance on a statute made it perfectly clear that their conduct was not only in good faith but reasonable. See *Michigan* v. *DeFillippo,* 443 U. S. 31 (1979). Until today the rule has been simple: conduct that exceeds the scope of an official's lawful discretion is not conduct the sovereign has authorized and hence is subject to injunction.[16] Whether that conduct also gives rise to damages liability is an entirely separate question.

---

[16] In a rather desperate attempt to explain these cases, *amici* suggest that the Court simply did not realize that it was deciding questions of state law, since in the era before *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), and *Mine Workers* v. *Gibbs*, 383 U. S. 715 (1966), it was not clear that diversity cases or pendent claims were governed by state rather than federal law. That suggestion is refuted by the cases discussed above in which it was held that relief could issue against state officers who had violated state statutes. Even under the construction of the Rules of Decision Act, 28 U. S. C. § 1652, adopted in *Swift* v. *Tyson*, 16 Pet. 1 (1842), and repudiated in *Erie*, federal courts were bound to apply state statutes. See, *e. g.*,

## III

On its face, the Eleventh Amendment applies only to suits against a State brought by citizens of other States and foreign nations.[17] This textual limitation upon the scope of the States' immunity from suit in federal court was set aside in *Hans* v. *Louisiana*, 134 U. S. 1 (1890). *Hans* was a suit against the State of Louisiana, brought by a citizen of Louisiana seeking to recover interest on the State's bonds. The Court stated that some of the arguments favoring sovereign immunity for the States made during the process of the Amendment's ratification had become a part of the judicial scheme created by the Constitution. As a result, the Court concluded that the Constitution prohibited a suit by a citizen against his or her own State. When called upon to elaborate in *Monaco* v. *Mississippi*, 292 U. S. 313 (1934), the Court explained that the Eleventh Amendment did more than simply prohibit suits brought by citizens of one State against another State. Rather, it exemplified the broader and more ancient doctrine of sovereign immunity, which operates to

---

*Black & White Taxicab & Transfer Co.* v. *Brown & Yellow Taxicab & Transfer Co.*, 276 U. S. 518, 529–531 (1928); *Swift*, 16 Pet., at 18–19. Thus, in these cases the Court was indisputably issuing relief under state law. The Court was explicit about the state-law basis for the relief it granted in *Greene*, to use just-one example. It stated that federal jurisdiction "extends, to the determination of all questions involved in the case, including questions of state law, irrespective of the disposition that may be made of the federal question, or whether it be found necessary to decide it at all." 244 U. S., at 508. It then granted plaintiffs relief under state law, and concluded by declining to decide any question of federal law. "It is obvious, however, in view of the result reached upon the questions of state law, just discussed, that the disposition of the cases would not be affected by whatever result we might reach upon the federal question . . . . Therefore, we find it unnecessary to express any opinion upon the question raised under the Fourteenth Amendment." *Id.*, at 519.

[17] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

bar a suit brought by a citizen against his own State without its consent.[18]

The Court has subsequently adhered to this interpretation of the Eleventh Amendment. For example, in *Quern* v. *Jordan*, 440 U. S. 332 (1979), the Court referred to the Eleventh Amendment as incorporating "the traditional sovereign immunity of the States." *Id.*, at 341. Similarly, in *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), the Court referred to "the Eleventh Amendment, and the principle of state sovereignty which it embodies . . . ." *Id.*, at 456. See also *Nevada* v. *Hall*, 440 U. S. 410, 438–441 (1979) (REHNQUIST, J., dissenting).[19] Thus, under our cases it is the doctrine of sovereign immunity, rather than the text of the Amendment

---

[18] "Manifestly, we cannot rest with a mere literal application of the words of § 2 or Article III, or assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against non-consenting states. Behind the words of the constitutional provisions are postulates which limit and control. There is the essential postulate that the controversies, as contemplated, shall be found to be of a justiciable character. There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.'" 292 U. S., at 322–323 (footnote omitted). See also *Ex parte State of New York*, 256 U. S. 490, 497 (1921); *Hans* v. *Louisiana*, 134 U. S. 1, 15–18 (1890). Most commentators have understood this Court's Eleventh Amendment cases as taking the position that the Constitution incorporates the common-law doctrine of sovereign immunity. See, *e. g.*, Baker, Federalism and the Eleventh Amendment, 48 U. Colo. L. Rev. 139, 153–158 (1977); Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part One, 126 U. Pa. L. Rev. 515, 538–546 (1978); Thornton, The Eleventh Amendment: An Endangered Species, 55 Ind. L. J. 293, 305–310 (1980); Tribe, Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism, 89 Harv. L. Rev. 682, 684–688 (1976); Comment, Private Suits Against States in the Federal Courts, 33 U. Chi. L. Rev. 331, 334–336 (1966).

[19] Petitioners themselves treat the Eleventh Amendment as equivalent to the doctrine of sovereign immunity. See Brief for Petitioners 12, n. 10. The Court appears to agree. *Ante,* at 98.

itself, which is critical to the analysis of any Eleventh Amendment problem.[20]

The doctrine of sovereign immunity developed in England, where it was thought that the King could not be sued. However, common-law courts, in applying the doctrine, traditionally distinguished between the King and his agents, on the theory that the King would never authorize unlawful conduct, and that therefore the unlawful acts of the King's officers ought not to be treated as acts of the sovereign. See 1 W. Blackstone, Commentaries *244. As early as the 15th century, Holdsworth writes, servants of the King were held liable for their unlawful acts. See 3 W. Holdsworth, A History of English Law 388 (1903). During the 17th century, this rule of law was used extensively to curb the King's authority. The King's officers

> "could do wrong, and if they committed wrongs, whether in the course of their employment or not, they could be made legally liable. The command or instruction of the king could not protect them. If the king really had given such commands or instructions, he must have been deceived." 6 *id.*, at 101 (footnote omitted).

In one famous case, it was held that although process would not issue against the sovereign himself, it could issue against his officers. "[F]or the warrant of no man, not even of the King himself, can excuse the doing of an illegal act." *Sands* v. *Child*, 3 Lev. 351, 352, 83 Eng. Rep. 725, 726 (K. B. 1693).[21] By the 18th century, this rule of law was unques-

---

[20] Of course, if the Court were to apply the text of the Amendment, it would not bar an action against Pennsylvania by one of its own citizens. See n. 17, *supra*.

[21] The rationale for this principle was compelling. Courts did not wish to confront the King's immunity from suit directly; nevertheless they found the threat to liberty posed by permitting the sovereign's abuses to go unremedied to be intolerable. Since in reality the King could act only through his officers, the rule which permitted suits against those officers formally preserved the sovereign's immunity while operating as one of the means by which courts curbed the abuses of the monarch. See 10 Holdsworth, at 262–268.

tioned. See 10 Holdsworth, *supra*, at 650–652. And in the 19th century this view was taken by the court to be so well settled as not to require the citation of authority, see *Feather* v. *Queen*, 6 B. & S. 257, 295–297, 122 Eng. Rep. 1191, 1205–1206 (Q. B. 1865).[22]

It was only natural, then, that this Court, in applying the principles of sovereign immunity, recognized the distinction between a suit against a State and one against its officer.[23] For example, while the Court did inquire as to whether a suit was "in essence" against the sovereign, it soon became settled law that the Eleventh Amendment did not bar suits against state officials in their official capacities challenging unconstitutional conduct. See *Smyth* v. *Ames*, 169 U. S. 466, 518–519 (1898); *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 10–12 (1891); *Poindexter* v. *Greenhow*, 114 U. S. 270, 288 (1885).[24] This rule was reconciled with sovereign immunity

---

[22] Commentators have noted the influence of these English doctrines on the American conception of sovereign immunity. See Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 19–29 (1963); Note, Express Waiver of Eleventh Amendment Immunity, 17 Ga. L. Rev. 513, 517–518 (1983); Note, Developments in the Law—Remedies Against the United States and its Officials, 70 Harv. L. Rev. 827, 831–833 (1957). In fact, in *Belknap* v. *Schild*, 161 U. S. 10 (1896), the Court, in holding that officers of the United States were liable for injuries caused by their unlawful conduct even if they did so acting pursuant to official duties, cited the passage from *Feather* v. *Queen*. See 161 U. S., at 18.

[23] Chief Justice Marshall, writing for the Court, recognized this distinction in the very first case to reach the Court concerning the application of the Eleventh Amendment to the conduct of a state official, *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824).

[24] See also *McNeill* v. *Southern R. Co.*, 202 U. S. 543, 559 (1906); *Gunter* v. *Atlantic Coast Line R. Co.*, 200 U. S. 273, 283–284 (1906); *Prout* v. *Starr*, 188 U. S. 537 (1903); *Scott* v. *Donald*, 165 U. S. 58, 67–70 (1897); *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S., at 388–391; *In re Tyler*, 149 U. S. 164, 190–191 (1893); *In re Ayers*, 123 U. S. 443, 506–507 (1887); *Hagood* v. *Southern*, 117 U. S. 52, 70 (1886); *Allen* v. *Baltimore & Ohio R. Co.*, 114 U. S. 311, 315–316 (1885); *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541 (1876). Cf. *United States* v. *Lee*, 106 U. S. 196, 219–222 (1882) (sovereign immunity of the United States not a defense against suit charging officers of the United States with unconstitutional conduct).

principles by use of the traditional rule that an action against an agent of the sovereign who had acted unlawfully was not considered to be against the sovereign. When an official acts pursuant to an unconstitutional statute, the Court reasoned, the absence of valid authority leaves the official ultra vires his authority, and thus a private actor stripped of his status as a representative of the sovereign.[25] In *Ex parte Young*, 209 U. S. 123 (1908), the Court was merely restating a settled principle when it wrote:

> "The Act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Id.*, at 159–160.[26]

---

[25] "That, it is true, is a legislative act of the government of Virginia, but it is not a law of the State of Virginia. The State has passed no such law, for it cannot; and what it cannot do, it certainly, in contemplation of law, has not done. The Constitution of the United States, and its own contract, both irrepealable by any act on its part, are the law of Virginia; and that law made it the duty of the defendant to receive the coupons tendered in payment of taxes, and declared every step to enforce the tax, thereafter taken, to be without warrant of law, and therefore a wrong. He stands, then, stripped of his official character; and, confessing a personal violation of the plaintiff's rights for which he must personally answer, he is without defence." *Poindexter* v. *Greenhow*, 114 U. S., at 288.

[26] See generally Orth, The Interpretation of the Eleventh Amendment, 1798–1908: A Case Study of Judicial Power, 1983 U. Ill. L. Rev. 423. The

The majority states that the holding of *Ex parte Young* is limited to cases in which relief is provided on the basis of federal law, and that it rests entirely on the need to protect the supremacy of federal law. That position overlooks the foundation of the rule of *Young* as well *Pennoyer* v. *McConnaughy* and *Young*'s other predecessors.

The *Young* Court distinguished between the State and its Attorney General because the latter, in violating the Constitution, had engaged in conduct the sovereign could not authorize. The pivotal consideration was not that the conduct violated federal law, since nothing in the jurisprudence of the Eleventh Amendment permits a suit against a sovereign merely because federal law is at issue.[27] Indeed, at least since *Hans* v. *Louisiana*, 134 U. S. 1 (1890), the law has been settled that the Eleventh Amendment applies even though the State is accused of violating the Federal Constitution. In *Hans* the Court held that the Eleventh Amendment applies to all cases within the jurisdiction of the federal courts including those brought to require compliance with federal law, and bars any suit where the State is the proper defendant under sovereign immunity principles. A long line of cases has endorsed that proposition, holding that irrespec-

---

Court has adhered to this formulation to the present day. See *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670, 684–690 (1982) (opinion of STEVENS, J.); *id.*, at 714–715 (WHITE, J., concurring in judgment in part and dissenting in part); *Ray* v. *Atlantic Richfield Co.*, 435 U. S., at 156, n. 6; *Scheuer* v. *Rhodes*, 416 U. S. 232, 237 (1974); *Georgia Railroad & Banking Co.* v. *Redwine*, 342 U. S. 299 (1952); *Sterling* v. *Constantin*, 287 U. S. 378, 393 (1932). Of course, the fragment from *Young* quoted by the Court, *ante*, at 109, n. 17, does not convey the same meaning when considered in the context of the paragraph quoted above.

[27] As the Solicitor General correctly notes in his brief, "this Court has no power to create any exception to a constitutional bar to federal court jurisdiction. *Ex parte Young* rests instead on recognition that the Eleventh Amendment simply does not apply to suits seeking to restrain illegal acts by state officials—whether those acts are illegal because they violate the Constitution, as in *Young*, or federal or state law." Brief for United States 23 (citations omitted).

146

tive of the need to vindicate federal law a suit is barred by the Eleventh Amendment if the State is the proper defendant.[28]  It was clear until today that "the State [is not] divested of its immunity 'on the mere ground that the case is one arising under the Constitution or laws of the United States.'"  *Parden* v. *Terminal Railway of Ala. Docks Dept.*, 377 U. S. 184, 186 (1964) (quoting *Hans*, 134 U. S., at 10).

The pivotal consideration in *Young* was that it was not conduct of the sovereign that was at issue.[29]  The rule that unlawful acts of an officer should not be attributed to the sovereign has deep roots in the history of sovereign immunity and makes *Young* reconcilable with the principles of sovereign immunity found in the Eleventh Amendment,[30] rather

---

[28] See *Quern* v. *Jordan*, 440 U. S. 332, 345, n. 17 (1979); *Alabama* v. *Pugh*, 438 U. S. 781 (1978) *(per curiam); Edelman* v. *Jordan*, 415 U. S. 651, 668–669 (1974); *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279, 280, n. 1 (1973); *Smith* v. *Reeves*, 178 U. S. 436, 444–449 (1900); *Fitts* v. *McGhee*, 172 U. S. 516 (1899); *In re Ayers*, 123 U. S. 443 (1887); *Hagood* v. *Southern*, 117 U. S. 52 (1886); *Louisiana* v. *Jumel*, 107 U. S. 711 (1883).  See generally C. Jacobs, The Eleventh Amendment and Sovereign Immunity 88–91, 109–110 (1972).

[29] The distinction between the sovereign and its agents not only explains why the rationale of *Ex parte Young* and its predecessors is consistent with established sovereign immunity doctrine, but it also explains the critical difference between actions for injunctive relief and actions for damages recognized in *Edelman* v. *Jordan*, 415 U. S. 651 (1973).  Since the damages remedy sought in that case would have required payment by the State, it could not be said that the action ran only against the agents of the State.  Therefore, while the agents' unlawful conduct was considered ultra vires and hence could be enjoined, a remedy which did run against the sovereign and not merely its agent could not fit within the ultra vires doctrine and hence was impermissible.  If damages are not sought from the State and the relief will run only against the state official, damages are a permissible remedy under the Eleventh Amendment.  See *Scheuer* v. *Rhodes*, 416 U. S., at 237–238.

[30] "While in England personification of sovereignty in the person of the King may have been possible, attempts to adopt this reasoning in the United States resulted in the postulation of the abstract State as sovereign.  Since the ideal State could only act by law, whatever the State did must be lawful.  On this ground a distinction was drawn between the State

than merely an unprincipled accommodation between federal and state interests that ignores the principles contained in the Eleventh Amendment.

This rule plainly applies to conduct of state officers in violation of state law. *Young* states that the significance of the charge of unconstitutional conduct is that it renders the state official's conduct "simply an illegal act," and hence the officer is not entitled to the sovereign's immunity. Since a state officer's conduct in violation of state law is certainly no less illegal than his violation of federal law, in either case the official, by committing an illegal act, is "stripped of his official or representative character." For example, one of *Young*'s predecessors held that a suit challenging an unconstitutional attempt by the Virginia Legislature to disavow a state contract was not barred by the Eleventh Amendment, reasoning that

> "inasmuch as, by the Constitution of the United States, *which is also the supreme law of Virginia*, that contract, when made, became thereby unchangeable, irrepealable by the State, the subsequent act of January 26, 1882, and all other like acts, which deny the obligation of that contract and forbid its performance, are not the acts of the State of Virginia. The true and real Commonwealth which contracted the obligation is incapable in law of doing anything in derogation of it. Whatever having that effect, if operative, has been attempted or done, is the work of its government acting without authority, in violation of *its* fundamental law, and must be looked upon, in all courts of justice, as if it were not and never had been. . . . The State of Virginia has done none of

and its government, which consisted of its officers, and since the State could not commit an illegal act, any such act was imputed to government officers. It logically followed that a suit against state officers was not necessarily a suit against the State." Note, The Sovereign Immunity of the States: The Doctrine and Some of its Recent Developments, 40 Minn. L. Rev. 234, 244–245 (1956) (footnotes omitted). Curiously, the majority appears to acknowledge that it has created a sovereign immunity broader than had ever been enjoyed by the King of England. *Ante*, at 114, n. 25.

these things with which this defence charges her. The defendant in error is not her officer, her agent, or her representative, in the matter complained of, for he has acted not only without *her* authority, but contrary to *her* express commands." *Poindexter* v. *Greenhow*, 114 U. S., at 292–293 (emphasis supplied).[31]

It is clear that the Court in *Poindexter* attached no significance to the fact that Virginia had been accused of violating federal and not its own law.[32] To the contrary, the Court treated the Federal Constitution as part of Virginia's law, and concluded that the challenged action was not that of Virginia precisely because it violated Virginia's law. The majority's position turns the *Young* doctrine on its head—sovereign immunity did not bar actions challenging unconstitutional conduct by state officers since the Federal Constitution was also to be considered part of the State's law—and since the State could not and would not authorize a violation of its own law, the officers' conduct was considered individual

---

[31] See also *Barney* v. *City of New York*, 193 U. S. 430, 439–441 (1904).

[32] This approach began long before *Poindexter*. The earliest cases in which this Court rejected sovereign immunity defenses raised by officers of the sovereign accused of unlawful conduct did not involve charges of unconstitutional conduct, but rather simple trespass actions. In rejecting the defense, the Court simply noted that although the officers were acting pursuant to their duties, they were engaged in unlawful conduct which therefore could not be the conduct of the sovereign. See *Bates* v. *Clark*, 95 U. S. 204, 209 (1877); *Mitchell* v. *Harmony*, 13 How. 115, 137 (1852); *Wise* v. *Withers*, 3 Cranch 331 (1806); *Little* v. *Barreme*, 2 Cranch 170 (1804). In the landmark case of *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824), the Court took it as beyond argument that if a state officer unlawfully seized property in an attempt to collect taxes he believed to be owed the State, the Eleventh Amendment would not bar a simple trespass action against the officer. The majority strangely takes comfort in the fact that the former cases allowed damages actions against federal officers. *Ante*, at 111, n. 21. The allowance of a damages remedy is no more consistent with the Court's approach than the allowance of an injunction, see n. 10, *supra*.

and not sovereign. No doubt the Courts that produced *Poindexter* and *Young* would be shocked to discover that conduct authorized by state law but prohibited by federal law is not considered conduct attributable to the State for sovereign immunity purposes, but conduct prohibited by state law is considered conduct attributable to the very State which prohibited that conduct. Indeed, in *Tindal* v. *Wesley*, 167 U. S. 204 (1899), the Court specifically found that it was impossible to distinguish between a suit challenging unconstitutional conduct of state officers and a suit challenging any other type of unlawful behavior:

> "If a suit against officers of a State to enjoin them from enforcing an unconstitutional statute . . . be not one against the State, it is impossible to see how a suit against the individuals to recover the possession of property belonging to the plaintiff and illegally withheld by the defendants can be deemed a suit against the State." *Id.*, at 222.[33]

These cases are based on the simple idea that an illegal act strips the official of his state-law shield, thereby depriving the official of the sovereign's immunity. The majority criticizes this approach as being "out of touch with reality" because it ignores the practical impact of an injunction on the

---

[33] To the same effect as *Tindal* is *South Carolina* v. *Wesley*, 155 U. S. 542 (1895). The majority argues that the case notes that South Carolina was not a party to the proceeding and suggests the ruling was "purely procedural," *ante*, at 109, n. 19, but that misses the whole purpose of the "procedural" point made in the opinion—Eleventh Amendment immunity may only be claimed by the State; it does not extend to state officers accused of violating state law. See also *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S., at 697 (opinion of STEVENS, J.) ("If conduct of a state officer taken pursuant to an unconstitutional state statute is deemed to be unauthorized and may be challenged in federal court, conduct undertaken without any authority whatever is also not entitled to Eleventh Amendment immunity").

State though directed at its officers. *Ante,* at 106–108. Yet that criticism cannot account for *Young,* since an injunction has the same effect on the State whether it is based on federal or state law. Indeed, the majority recognizes that injunctions approved by *Young* have an "obvious impact on the State itself," *ante,* at 104. In the final analysis the distinction between the State and its officers, realistic or not, is one firmly embedded in the doctrine of sovereign immunity. It is that doctrine and not any theory of federal supremacy which the Framers placed in the Eleventh Amendment and which this Court therefore has a duty to respect.

It follows that the basis for the *Young* rule is present when the officer sued has violated the law of the sovereign; in all such cases the conduct is of a type that would not be permitted by the sovereign and hence is not attributable to the sovereign under traditional sovereign immunity principles. In such a case, the sovereign's interest lies with those who seek to enforce its laws, rather than those who have violated them.

> "[P]ublic officials may become tort-feasors by exceeding the limits of their authority. And where. they unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity . . . [t]he dominant interest of the sovereign is then on the side of the victim who may bring his possessory action to reclaim that which is wrongfully withheld." *Land* v. *Dollar,* 330 U. S. 731, 738 (1947).[34]

The majority's position that the Eleventh Amendment does not permit federal courts to enjoin conduct that the sovereign State itself seeks to prohibit thus is inconsistent with both

---

[34] While *Land* v. *Dollar* is a case dealing with the sovereign immunity of the Federal Government, it is pertinent to the Eleventh Amendment, which after all for present purposes is no more than an embodiment of sovereign immunity principles.

the doctrine of sovereign immunity and the underlying respect for the integrity of state policy which the Eleventh Amendment protects. The issuance of injunctive relief which enforces state laws and policies, if anything, enhances federal courts' respect for the sovereign prerogatives of the States.[35] The majority's approach, which requires federal courts to ignore questions of state law and to rest their decisions on federal bases, will create more rather than less friction between the States and the federal judiciary.

Moreover, the majority's rule has nothing to do with the basic reason the Eleventh Amendment was added to the Constitution. There is general agreement that the Amendment was passed because the States were fearful that federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin.[36] Entertaining a suit for injunctive relief based on state law implicates none of the concerns of the Framers. Since only injunctive relief is sought there is no threat to the state treasury of the type that concerned the Framers, see *Milliken* v. *Bradley*, 433 U. S. 267, 288–290 (1977); *Edelman* v. *Jordan*, 415 U. S. 651, 667–668 (1974); and if the State wishes to avoid the federal injunction, it can easily do so simply by changing its law. The possibility of States left helpless in the face of disruptive federal decrees which led to the passage of the Eleventh

---

[35] For example, in cases barring suits against individual officers as suits against the State, the Court has also acknowledged the importance of state-law authority for the challenged conduct of the officer. In such cases the Court has frequently noted that the relief sought would be unauthorized by state law and would therefore adversely affect the State itself. See, *e. g., Hagood* v. *Southern*, 117 U. S., at 68; *Louisiana* v. *Jumel*, 107 U. S., at 721. In contrast, in cases of official actions contrary to state law, a federal court's remedy would not adversely affect any state policy.

[36] See, *e. g., Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275, 276, n. 1 (1959); *Missouri* v. *Fiske*, 290 U. S. 18, 27 (1933); *Cohens* v. *Virginia*, 6 Wheat. 264, 406–407 (1821).

Amendment simply is not presented by this case. Indeed, the Framers no doubt would have preferred federal courts to base their decisions on state law, which the State is then free to reexamine, rather than forcing courts to decide cases on federal grounds, leaving the litigation beyond state control.

In light of the preceding, it should come as no surprise that there is absolutely no authority for the majority's position that the rule of *Young* is inapplicable to violations of state law. The only cases the majority cites, *ante*, at 105–106, for the proposition that *Young* is limited to the vindication of federal law do not consider the question whether *Young* permits injunctive relief on the basis of state law—in each of the cases the question was neither presented, briefed, argued, nor decided.[37] It is curious, to say the least, that the majority disapproves of reliance on cases in which the issue we face today was decided *sub silentio*, see *ante*, at 119, yet it is willing to rely on cases in which the issue was not decided at all. In fact, not only is there no precedent for the majority's position, but, as I have demonstrated in Part II, *supra*, there is an avalanche of precedent squarely to the contrary.[38]

---

[37] The majority cites *Quern* v. *Jordan*, 440 U. S. 332 (1979); *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974); *Edelman* v. *Jordan*, 415 U. S. 651 (1974); *Georgia Railroad & Banking Co.* v. *Redwine*, 342 U. S. 299 (1952). In each of these cases, the only question presented or decided was whether *monetary* relief could be obtained against state officials on the basis of *federal* law, except for *Redwine*, where the Court decided that a suit to enjoin collection of a state tax on the basis of *federal* law was *not* barred by the Eleventh Amendment. In none of these cases was any question concerning the availability of injunctive relief under *state* law considered even in dicta.

[38] In addition to overruling the cases discussed in Part II, *supra*, the majority's view that *Young* exists simply to ensure the supremacy of federal law indicates that a number of our prior cases, which held that the Eleventh Amendment may bar an action for injunctive relief even where the State has violated the Federal Constitution, see, *e. g.*, *Alabama* v. *Pugh*, 438 U. S. 781 (1978) *(per curiam)*, were incorrectly decided. The Court can have no satisfactory explanation for *Pugh*, which held that even as to a federal constitutional claim, a suit may not be brought directly against a State even where it may be brought against its officials. On the majority's

That the doctrine of sovereign immunity does not protect conduct which has been prohibited by the sovereign is clearly demonstrated by the case on which petitioners chiefly rely, *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682 (1949). The *Larson* opinion teaches that the actions of state officials are not attributable to the State—are ultra vires—in two different types of situations: (1) when the official is engaged in conduct that the sovereign has not authorized, and (2) when he has engaged in conduct that the sovereign has forbidden. A sovereign, like any other principal, cannot authorize its agent to violate the law. When an agent does so, his actions are considered ultra vires and he is liable for his own conduct under the law of agency. Both types of ultra vires conduct are clearly identified in *Larson.*

"There may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. If the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign. If the War Assets Administrator had completed a sale of his personal home, he presumably could be enjoined from later conveying it to a third person. On a similar theory, *where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.* The officer is not doing

view, there is no basis for distinguishing between the State and its officials—as to both there is a need to vindicate the supremacy of federal law through the issuance of injunctive relief, and unless the officials are acting completely outside of their authority, they must be treated as is the State. However, *Pugh* can be explained simply by reference to *Young*'s use of the ultra vires doctrine with respect to unconstitutional conduct by state officers—such conduct is not conduct by the sovereign because it could not be authorized by the sovereign, hence the officers are not entitled to the sovereign's immunity. A suit directly against the State cannot succeed because the ultra vires doctrine is unavailable without a state officer to which it can be applied. *Pugh* makes it clear that *Young* rests not on a need to vindicate federal law, but on the traditional distinction between the sovereign and its agents.

the business which the sovereign has empowered him to do *or he is doing it in a way which the sovereign has forbidden.* His actions are *ultra vires* his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient. And, since the jurisdiction of the court to hear the case may depend, as we have recently recognized, upon the decision which it ultimately reaches on the merits, it is necessary that the plaintiff set out in his complaint the statutory limitation on which he relies." *Id.*, at 689–690 (emphasis supplied).

*Larson* thus clearly indicates that the immunity determination depends upon the merits of the plaintiff's claim. The same approach is employed by *Young*—the plaintiff can overcome the state official's immunity only by succeeding on the merits of its claim of unconstitutional conduct.

Following the two-track analysis of *Larson,* the cases considering the question whether the state official is entitled to the sovereign's immunity can be grouped into two categories. In cases like *Larson, Malone* v. *Bowdoin,* 369 U. S. 643 (1962), and *Florida Dept. of State* v. *Treasure Salvors, Inc.,* 458 U. S. 670 (1982), which usually involve the State functioning in its proprietary capacity, the ultra vires issue can be resolved solely by reference to the law of agency. Since there is no specific limitation on the powers of the officers other than the general limitations on their authority, the only question that need be asked is whether they have acted completely beyond their authority. But when the State has placed specific limitations on the manner in which state officials may perform their duties, as it often does in regulatory or other administrative contexts such as were considered in *Scully* v. *Bird,* 209 U. S. 481 (1908), and *Johnson* v.

*Lankford*, 245 U. S. 541 (1918), the ultra vires inquiry also involves the question whether the officials acted in a way that state law forbids. No sovereign would authorize its officials to violate its own law, and if the official does so, then *Larson* indicates that his conduct is ultra vires and not protected by sovereign immunity.

*Larson* confirms that the Court's disposition of this case in 1981—ordering the Court of Appeals to consider respondents' state-law claims—was fully harmonious with established sovereign immunity principles. The jurisdiction of the federal court was established by a federal claim;[39] the Court of Appeals therefore had jurisdiction to resolve the case and to grant injunctive relief on either federal or state grounds. Respondents pleaded a specific statutory limitation on the way in which petitioners were entitled to run Pennhurst. The District Court and the Court of Appeals have both found that petitioners operated Pennhurst in a way that the sovereign has forbidden. Specifically, both courts concluded that petitioners placed residents in Pennhurst without any consideration at all of the limitations on institutional confinement that are found in state law, and that they failed to create community living programs that are mandated by state law. In short, there can be no dispute that petitioners ran Pennhurst in a way that the sovereign had

---

[39] There can be no doubt that respondents' federal claims were sufficiently substantial to justify federal jurisdiction in this case. In another case brought by a resident of Pennhurst, we held that the Due Process Clause of the Fourteenth Amendment requires, at a minimum, that petitioners provide the residents with reasonable care and safety. See *Youngberg* v. *Romeo*, 457 U. S. 307, 324 (1982). The uncontested findings of the District Court in this case establish that Pennhurst neither was safe nor was it providing reasonable care to its residents. Therefore, respondents' federal claims not only were sufficiently substantial to support the exercise of federal jurisdiction in this case, but also would almost certainly have justified the issuance of at least some injunctive relief had a state-law basis for the relief been unavailable.

forbidden.  Under the second track of the *Larson* analysis, petitioners were acting ultra vires because they were acting in a way that the sovereign, by statute, had forbidden.[40]

---

[40] In *Larson*, the Administrator of the War Assets Administration was in possession of coal that the plaintiff claimed the Administrator was contractually obligated to deliver to it.   Instead of seeking damages for breach of contract in the Court of Claims, the plaintiff sought an injunction in the District Court.   The Court held that the Administrator had acted properly in refusing to deliver the coal and instead insisting that the plaintiff seek its remedy in the Court of Claims.

"There was, it is true, an allegation that the Administrator was acting 'illegally,' and that the refusal to deliver was 'unauthorized.'   But these allegations were not based and did not purport to be based upon any lack of delegated power.   Nor could they be, since the Administrator was empowered by the sovereign to administer a general sales program encompassing the negotiation of contracts, the shipment of goods and the receipt of payment. A normal concomitant of such powers, as a matter of general agency law, is the power to refuse delivery when, in the agent's view, delivery is not called for under a contract and the power to sell goods which the agent believes are still his principal's to sell."   337 U. S., at 691–692 (footnotes omitted).

Thus, the Administrator had acted properly.   He was doing what any agent would do—holding on to property he believed was his principal's and insisting that the claimant sue the principal if it wanted the property.   He was merely exercising the "normal" duties of a sales agent.   Congress envisioned that he do exactly that; the remedy it had provided required the claimant to sue for damages in the Court of Claims rather than obtaining the property directly from the Administrator, and no one had questioned the constitutional sufficiency of that alternative remedy.   See McCord, Fault Without Liability: Immunity of Federal Employees, 1966 U. Ill. Law Forum 849, 862–867.   "Since the plaintiff had not made an affirmative allegation of any relevant statutory limitation upon the Administrator's powers, and had made no claim that the Administrator's action amounted to an unconstitutional taking, the Court ruled that the suit must fail as an effort to enjoin the United States." *Malone* v. *Bowdoin*, 369 U. S. 643, 647 (1962).   *Malone* can be explained similarly.   These cases hold that Congress had empowered the governmental official to make necessary decisions about whether to hold on to property the official believes is the Government's, at least pending the aggrieved party's remedy in the Claims Court (formerly Court of Claims) under the Tucker Act, 28 U. S. C. § 1491 *et seq.* (1982 ed.).   See Byse, Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties,

Petitioners readily concede, both in their brief and at oral argument, that the Eleventh Amendment does not bar a suit against state officers who have acted ultra vires. The majority makes a similar concession, *ante*, at 101–102, n. 11. Yet both ignore the fact that the cases, and most especially *Larson*, set out a two-step analysis for ultra vires conduct— conduct that is completely beyond the scope of the officer's authority, or conduct that the sovereign has forbidden. In fact, the majority goes so far as to quote the passage from *Larson* indicating that a state official acts ultra vires when he completely lacks power delegated from the State, *ante*, at 101, n. 11. That quotation ignores sentences immediately preceding and following the quoted passage stating in terms that where an official violates a statutory prohibition, he acts ultra vires and is not protected by sovereign immunity. This omission is understandable, since petitioners' conduct in this case clearly falls into the category of conduct the sovereign has specifically forbidden by statute. Petitioners were told by Pennsylvania how to run Pennhurst, and there is no dispute that they disobeyed their instructions. Yet without explanation, the Court repudiates the two-track analysis of *Larson* and holds that sovereign immunity extends to conduct the sovereign has statutorily prohibited.[41] Thus, con-

---

Mandamus, 75 Harv. L. Rev. 1479, 1490–1491 (1962); Jaffe, The Right to Judicial Review I, 71 Harv. L. Rev. 401, 436–437 (1958). Thus, where the official acts as the sovereign intends, he is entitled to the sovereign's immunity under the principles discussed above. Where that is not the case, *Larson* permits injunctive relief. In this case, respondents did plead a specific limitation on petitioners' powers, and the holding of the Court of Appeals on the merits of respondents' state-law claims indicates that petitioners were not exercising the "normal" duties that the sovereign had envisioned for them, unlike the Administrator in *Larson*. Instead, petitioners were running Pennhurst "in a way which the sovereign has forbidden." 337 U. S., at 689.

[41] The majority also repudiates JUSTICE WHITE's recent statement in *Treasure Salvors:* "where the officer's actions are limited by statute, actions beyond those limitations are to be considered individual and not sovereign actions." 458 U. S., at 714. Four Members of today's majority subscribed to that statement only two Terms ago.

trary to the Court's assertion, *Larson* is in conflict with the result reached today.[42]

In sum, a century and a half of this Court's Eleventh Amendment jurisprudence has established the following. A suit alleging that the official had acted within his authority but in a manner contrary to state statutes was not barred because the Eleventh Amendment prohibits suits against States; it does not bar suits against state officials for actions not permitted by the State under its own law. The sovereign could not and would not authorize its officers to violate its own law; hence an action against a state officer seeking redress for conduct not permitted by state law is a suit against the officer, not the sovereign. *Ex parte Young* concluded in as explicit a fashion as possible that unconstitutional action by state officials is not action by the State even if it purports to be authorized by state law, *because the Federal Constitution strikes down the state-law shield*. In the tort cases, if the plaintiff proves his case, there is by definition no state-law defense to shield the defendant. Similarly, *when the state officer violates a state statute, the sovereign has by definition erected no shield against liability*. These precedents make clear that there is no foundation for the contention that the majority embraces—that *Ex parte Young* authorizes injunctive relief against state officials only on the basis of federal law. To the contrary, *Young* is as clear as a

---

[42] Indeed, the majority senses as much, by admitting that it cannot reconcile the ultra vires doctrine endorsed by *Larson* with its approach. See *ante*, at 114, n. 25. The majority is also incorrect in suggesting that *Larson* overruled most if not all of the cases contrary to its position. In fact, *Larson* cited most of those cases with approval, including *Hopkins* v. *Clemson Agricultural College*, 221 U. S. 636 (1911), *Tindal* v. *Wesley*, 167 U. S. 204 (1896), *Poindexter* v. *Greenhow*, 114 U. S. 270 (1885), and *Land* v. *Dollar*, 330 U. S. 731 (1947); the *Larson* opinion stated that it was overruling only a single case, *Goltra* v. *Weeks*, 271 U. S. 536 (1926). See 337 U. S., at 698–702. *Larson* simply did not wreak the kind of havoc on this Court's precedents that the majority does today.

bell: the Eleventh Amendment does not apply where there is no state-law shield. That simple principle should control this case.

## IV

The majority's decision in this case is especially unwise in that it overrules a long line of cases in order to reach a result that is at odds with the usual practices of this Court. In one of the most respected opinions ever written by a Member of this Court, Justice Brandeis wrote:

> "The Court [has] developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision. They are:
>
> .        .        .        .        .
>
> ". . . The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175, 191." *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (1936) (concurring opinion).

The *Siler* case, cited with approval by Justice Brandeis in *Ashwander*, employed a remarkably similar approach to that used by the Court of Appeals in this case. A privately owned railroad corporation brought suit against the members of the railroad commission of Kentucky to enjoin the enforcement of a rate schedule promulgated by the commission. The Federal Circuit Court found that the schedule violated the plaintiff's federal constitutional rights and granted re-

lief. This Court affirmed, but it refused to decide the constitutional question because injunctive relief against the state officials was adequately supported by state law. The Court held that the plaintiff's claim that the schedule violated the Federal Constitution was sufficient to justify the assertion of federal jurisdiction over the case, but then declined to reach the federal question, deciding the case on the basis of state law instead:

> "Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons. In this case we think it much better to decide it with regard to the question of a local nature, involving the construction of the state statute and the authority therein given to the commission to make the order in question, rather than to unnecessarily decide the various constitutional questions appearing in the record." *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175, 193 (1909).[43]

The *Siler* principle has been applied on numerous occasions; when a suit against state officials has presented both federal constitutional questions and issues of state law, the Court has upheld injunctive relief on state-law grounds. See, *e. g., Lee* v. *Bickell*, 292 U. S. 415, 425 (1934); *Glenn* v. *Field Packing Co.*, 290 U. S. 177, 178 (1933); *Davis* v. *Wallace*, 257 U. S. 478, 482–485 (1922); *Louisville & Nashville R. Co.* v. *Greene*, 244 U. S., at 527; *Greene* v. *Louisville & Interurban R. Co.*, 244 U. S., at 508, 512–514.[44]

---

[43] In *Siler* the Court decided the case on state-law grounds, even though it acknowledged that "[i]n this case we are without the benefit of a construction of the statute by the highest state court of Kentucky, and we must proceed in the absence of state adjudication upon the subject." 213 U. S., at 194.

[44] Justice Peckham's opinion in *Siler* rested on a long line of cases, dating back to Chief Justice Marshall's decision in *Osborn* v. *Bank of United States,* 9 Wheat., at 822, holding that a federal court has jurisdiction over all the issues—state as well as federal—presented by a case that

In *Hagans* v. *Lavine*, 415 U. S. 528 (1974), the Court quoted from the *Siler* opinion and noted that the "Court has characteristically dealt first with possibly dispositive state law claims pendent to federal constitutional claims." 415 U. S., at 546. It added:

"Numerous decisions of this Court have stated the general proposition endorsed in *Siler*—that a federal court properly vested with jurisdiction may pass on the state or local law question without deciding the federal constitutional issues—and have then proceeded to dis-

properly falls within its jurisdiction. Nor was *Siler* breaking new ground in avoiding a federal constitutional question by deciding on state-law grounds. In *Santa Clara County* v. *Southern Pacific R. Co.*, 118 U. S. 394 (1886), the Court noted the importance of the federal constitutional questions. Even though these had been treated as dispositive by the lower court, and though they were the "main—almost the only—questions discussed by counsel," *id.*, at 395, the Court stated: "These questions belong to a class which this court should not decide, unless their determination is essential to the disposal of the case in which they arise." *Id.*, at 410. It then determined that the challenged tax assessments were not authorized by state law and affirmed the judgment solely on that ground. In addition, the Court has routinely applied the *Siler* rule in cases upholding injunctive relief on the basis of state law against municipal officials, see, *e. g.*, *Hillsborough* v. *Cromwell*, 326 U. S. 620, 629 (1946); *Cincinnati* v. *Vester*, 281 U. S. 439, 448–449 (1930); *Risty* v. *Chicago, R. I. & P. R. Co.*, 270 U. S. 378 (1926); *Bohler* v. *Callaway*, 267 U. S. 479, 489 (1925); *Lincoln Gas & Electric Light Co.* v. *City of Lincoln*, 250 U. S. 256, 268–269 (1919); and in cases in which the plaintiffs were not held to be entitled to the relief they sought, see *Schmidt* v. *Oakland Unified School Dist.*, 457 U. S. 594 (1982) *(per curiam); Railroad Comm'n of California* v. *Pacific Gas & Electric Co.*, 302 U. S. 388, 391 (1938); *United Fuel Gas Co.* v. *Railroad Comm'n of Ky.*, 278 U. S. 300, 307 (1929); *Waggoner Estate* v. *Wichita County*, 273 U. S. 113, 116 (1927); *Chicago Great Western R. Co.* v. *Kendall*, 266 U. S. 94, 97–98 (1924); *Ohio Tax Cases*, 232 U. S. 576, 586–587 (1914); *Louisville & Nashville R. Co.* v. *Garrett*, 231 U. S. 298, 303–304 (1913). Numerous other cases decided by this Court have cited *Siler* as an accurate statement of the law regarding pendent jurisdiction. See, *e. g.*, *Aldinger* v. *Howard*, 427 U. S. 1, 7 (1976); *Florida Lime and Avocado Growers, Inc.* v. *Jacobsen*, 362 U. S. 73, 81, n. 7 (1960); *Hurn* v. *Oursler*, 289 U. S. 238, 243–245 (1933).

pose of the case solely on the nonfederal ground. See, *e. g., Hillsborough* v. *Cromwell*, 326 U. S. 620, 629–630 (1946); *Waggoner Estate* v. *Wichita County*, 273 U. S. 113, 116–119 (1927); *Chicago G. W. R. Co.* v. *Kendall*, 266 U. S. 94 (1924); *United Gas Co.* v. *Railroad Comm'n*, 278 U. S. 300, 308 (1929); *Risty* v. *Chicago, R. I. & P. R. Co.*, 270 U. S. 378, 387 (1926). These and other cases illustrate in practice the wisdom of the federal policy of avoiding constitutional adjudication where not absolutely essential to disposition of a case." *Id.*, at 547, n. 12.

In fact, in this very case we applied the *Siler* rule by remanding the case to the Court of Appeals with explicit instructions to consider whether respondents were entitled to relief under state law.

Not only does the *Siler* rule have an impressive historical pedigree, but it is also strongly supported by the interest in avoiding duplicative litigation and the unnecessary decision of federal constitutional questions.

"The policy's ultimate foundations . . . lie in all that goes to make up the unique place and character, in our scheme, of judicial review of governmental action for constitutionality. They are found in the delicacy of that function, particularly in view of possible consequences for others stemming also from constitutional roots; the comparative finality of those consequences; the consideration due to the judgment of other repositories of constitutional power concerning the scope of their authority; the necessity, if government is to function constitutionally, for each to keep within its power, including the courts; the inherent limitations of the judicial process, arising especially from its largely negative character and limited resources of enforcement; withal in the paramount importance of constitutional adjudication in our

system." *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 571 (1947).[45]

In addition, application of the *Siler* rule enhances the decisionmaking autonomy of the States. *Siler* directs the federal court to turn first to state law, which the State is free to modify or repeal.[46] By leaving the policy determinations underlying injunctive relief in the hands of the State, the Court of Appeals' approach gives appropriate deference to established state policies.

In contrast, the rule the majority creates today serves none of the interests of the State. The majority prevents federal courts from implementing state policies through equitable enforcement of state law. Instead, federal courts are required to resolve cases on federal grounds that no state authority can undo. Leaving violations of state law unredressed and ensuring that the decisions of federal courts may never be reexamined by the States hardly comports with the respect for States as sovereign entities commanded by the Eleventh Amendment.

## V

One basic fact underlies this case: far from immunizing petitioners' conduct, the State of Pennsylvania prohibited it. Respondents do not complain about the conduct of the State of Pennsylvania—it is Pennsylvania's commands which they seek to enforce. Respondents seek only to have Pennhurst

---

[45] Cf. *H. L.* v. *Matheson*, 450 U. S. 398, 407 (1981) (citing Justice Brandeis' opinion in *Ashwander* v. *TVA*, 297 U. S. 288 (1936)); *Hutchinson* v. *Proxmire*, 443 U. S. 111, 122 (1979) (citing the Court's opinion in *Siler*).

[46] In some of the cases following *Siler*, this Court has required that the decree include a provision expressly authorizing its reopening in the event that a state court later decided the question of state law differently. See *Lee* v. *Bickell*, 292 U. S. 415, 426 (1934); *Wald Transfer & Storage Co.* v. *Smith*, 290 U. S. 602 (1933); *Glenn* v. *Field Packing Co.*, 290 U. S. 177, 178–179 (1933).

run the way Pennsylvania envisioned that it be run. Until today, the Court understood that the Eleventh Amendment does not shield the conduct of state officers which has been prohibited by their sovereign.

Throughout its history this Court has derived strength from institutional self-discipline. Adherence to settled doctrine is presumptively the correct course.[47] Departures are, of course, occasionally required by changes in the fabric of our society.[48] When a court, rather than a legislature, initi-

---

[47] "I agree with what the Court stated only days ago, that 'the doctrine of *stare decisis*, while perhaps never entirely persuasive on a constitutional question, is a doctrine that demands respect in a society governed by the rule of law.' *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 419–420 (1983). While the doctrine of *stare decisis* does not absolutely bind the Court to its prior opinions, a decent regard for the orderly development of the law and the administration of justice requires that directly controlling cases be either followed or candidly overruled." *Solem* v. *Helm*, 463 U. S. 277, 311–312 (1983) (BURGER, C. J., dissenting) (footnote omitted).

This statement was joined by four Members of today's majority. The fifth was the author of the opinion of the Court in *City of Akron*.

[48] This is an especially odd context in which to repudiate settled law because changes in our social fabric favor limitation rather than expansion of sovereign immunity. The concept that the sovereign can do no wrong and that citizens should be remediless in the face of its abuses is more a relic of medieval thought than anything else.

"Whether this immunity is an absolute survival of the monarchial privilege, or is a manifestation merely of power, or rests on abstract logical grounds, it undoubtedly runs counter to modern democratic notions of the moral responsibility of the State. Accordingly, courts reflect a strong legislative momentum in their tendency to extend the legal responsibility of Government and to confirm Maitland's belief, expressed nearly fifty years ago that, 'it is a wholesome sight to see "the Crown" sued and answering for its torts.'" *Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47, 59 (1944) (Frankfurter, J., dissenting) (citation omitted).

In the even older decision of *Poindexter* v. *Greenhow*, 114 U. S. 270 (1885), the Court, after observing that "the distinction between the government of a State and the State itself is important, and should be observed," *id.*, at 290, wrote:

ates such a departure, it has a special obligation to explain and to justify the new course on which it has embarked. Today, however, the Court casts aside well-settled respected doctrine that plainly commands affirmance of the Court of Appeals—the doctrine of the law of the case,[49] the doctrine of *stare decisis* (the Court repudiates at least 28 cases),[50] the

"This distinction is essential to the idea of constitutional government. To deny it or blot it out obliterates the line of demarcation that separates constitutional government from absolutism, free self-government based on the sovereignty of the people from that despotism, whether of the one or the many, which enables the agent of the State to declare and decree that he is the State; to say '*L'Etat c'est moi.*' Of what avail are written constitutions whose bills of right for the security of individual liberty have been written, too often, with the blood of martyrs shed upon the battlefield and the scaffold, if their limitations and restraints upon power may be overpassed with impunity by the very agencies created and appointed to guard, defend, and enforce them; and that, too, with the sacred authority of law, not only compelling obedience, but entitled to respect? And how else can these principles of individual liberty and right be maintained, if, when violated, the judicial. tribunals are forbidden to visit penalties upon individual offenders, who are the instruments of wrong, whenever they interpose the shield of the State? The doctrine is not to be tolerated. The whole frame and scheme of the political institutions of this country, State and Federal, protest against it. Their continued existence is not compatible with it. It is the doctrine of absolutism, pure, simple, and naked . . . ." *Id.*, at 291.

See also Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889 (1983).

[49] The heart of today's holding is that this Court had no power to act as it did in 1981 when it ordered the Court of Appeals to consider and decide the state-law issues in this very case.

[50] In the following cases the Court held injunctive relief may issue against state officers on the basis of state law after *explicitly* rejecting their Eleventh Amendment defense: *Rolston* v. *Missouri Fund Commissioners*, 120 U. S. 390 (1887); *South Carolina* v. *Wesley*, 155 U. S. 542 (1895); *Tindal* v. *Wesley*, 167 U. S. 204 (1897); *Scully* v. *Bird*, 209 U. S. 481 (1908); *Hopkins* v. *Clemson Agricultural College*, 221 U. S. 636 (1911); *Atchison T. & S. F. R. Co.* v. *O'Connor*, 223 U. S. 280 (1912); *Johnson* v. *Lankford*, 245 U. S. 541 (1918); *Martin* v. *Lankford*, 245 U. S. 547 (1918); *Greene* v. *Louisville & Interurban R. Co.*, 244 U. S. 499 (1917); *Louisville*

doctrine of sovereign immunity,[51] the doctrine of pendent jurisdiction,[52] and the doctrine of judicial restraint.   No sound reason justifies the further prolongation of this litigation or this Court's voyage into the sea of undisciplined lawmaking.

---

& Nashville R. Co. v. Greene, 244 U. S. 522 (1917); Illinois Central R. Co. v. Greene, 244 U. S. 555 (1917).

Since petitioners' position applies also to federal sovereign immunity (indeed the principal case on which they rely, Larson, is a federal sovereign immunity case), the following additional cases which refused to apply sovereign immunity to suits against federal officers acting within the scope of their authority because the plaintiff had alleged that the officers had engaged in unlawful conduct are rejected: Little v. Barreme, 2 Cranch 170 (1804); Wise v. Withers, 3 Cranch 331 (1806); Mitchell v. Harmony, 13 How. 115 (1852); Bates v. Clark, 95 U. S. 204 (1877); Belknap v. Schild, 161 U. S. 10 (1896); Sloan Shipyards Corp. v. United States Shipping Bd. Emergency Fleet Corp., 258 U. S. 549 (1922); Santa Fe Pacific R. Co. v. Fall, 259 U. S. 197 (1922); Philadelphia Co. v. Stimson, 223 U. S. 605 (1912); Land v. Dollar, 330 U. S., at 738.   Larson itself cites most of these cases with approval, and disapproves of none of them.   All are overruled today.   In fact, today the Court repudiates the two-track analysis of Larson, since in Larson the Court stated that conduct which has been specifically prohibited by statute is not protected by sovereign immunity even if it is performed within the scope of the official's duties, yet today the Court holds that even if an officer violates a statute, his conduct is protected by sovereign immunity.   The Court also overrules the cases cited in n. 52, infra.   If some of these cases have been rarely cited, see ante, at 115–116, n. 27, this is because until today the law was thought to be well settled on this point.

[51] From the 15th-century English common law to Larson and beyond, courts have never held that prohibited conduct can be shielded by sovereign immunity.   That rule makes good sense—since a principal cannot authorize unlawful conduct, such conduct is of necessity ultra vires. There is no reason to abandon such a well-settled and sensible rule.

[52] The majority also overrules Siler v. Louisville & Nashville R. Co., 213 U. S. 175 (1909), and its progeny, including Louisville & Nashville R. Co. v. Garrett, 231 U. S. 298 (1913); Davis v. Wallace, 257 U. S. 478 (1922); Chicago Great Western R. Co. v. Kendall, 266 U. S. 94 (1924); United Fuel Gas Co. v. Railroad Comm'n of Ky., 278 U. S. 300 (1929); Glenn v. Field Packing Co., 290 U. S. 177 (1933); Lee v. Bickell, 292 U. S. 415 (1934); Railroad Comm'n of California v. Pacific Gas & Electric Co., 302 U. S. 388 (1938).

As I said at the outset, this case has illuminated the character of an institution.

I respectfully dissent.